**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 17, 2012

Lyle W. Cayce
Clerk

No. 11-20141

PETROFAC, INCORPORATED,

Plaintiff - Appellee,

v.

DYNMCDERMOTT PETROLEUM OPERATIONS COMPANY,

Defendant - Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before DeMOSS, CLEMENT, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

DynMcDermott Petroleum Operations Company (DM) appeals the district court's confirmation of an arbitration award in favor of Petrofac, Incorporated. Because DM fails to show any reversible error, we AFFIRM.

I.

DM operates the Strategic Petroleum Reserve for the Department of Energy. DM subcontracted with Petrofac to design and install a transportable degas plant to service the reserve. On July 30, 2003, DM and Petrofac agreed to resolve any claim under the subcontract through binding arbitration. The contract stated:

Petrofac and DM agree to enter into binding arbitration for any

Request for Equitable Adjustment or claim submitted against the referenced subcontract, in lieu of litigation, in the event that a mutually agreeable resolution cannot be bilaterally achieved between DM and Petrofac through negotiations.

In May 2004, Petrofac sent DM a multi-volume Request for Equitable Adjustment (REA). There, Petrofac asserted that DM disrupted Petrofac's ability to perform its work and sought damages for differing site conditions, delays, disruption costs, lost productivity, and acceleration costs.

On December 6, 2005, Petrofac agreed to release DM from all but a few specifically preserved claims. Among these preserved claims, the release included Petrofac's REA "as may be amended or supplemented."[1]

By July 2006, the parties had failed to resolve the REA dispute via negotiation. Pursuant to the 2003 arbitration agreement, DM and Petrofac entered into an "Agreement for Arbitration and for Location and Methodology of Arbitration." There, the parties agreed that "[t]hey shall submit to binding arbitration the [REA] and all claims and disputes between them arising out of or relating to the Subcontract." In addition, the parties agreed that the arbitration would be conducted by the American Arbitration Association under

---

[1] The release stated that:

In consideration of payments made heretofore, or to be made, by DM . . . [Petrofac] hereby unconditionally releases DM . . . from any and all liens and claims whatsoever arising out of or during the performance of said Subcontract other than such claims, if any, that may . . . be specifically excepted from the terms of this Release and Certificate, stated below:

1. Request for Equitable Adjustment submitted by Petrofac, Inc. as may be amended or supplemented;
2. Invoice No. 2004-79-855 in the amount of $995,718.00 . . . ;
3. Invoice No. 2005-01-855 in the amount of $338,400.00;
4. All rights and claims of [Petrofac] in connection with its disputes and objections to DM's Unilateral Change Orders 17, 18, and 22;
5. Claim for Equitable Adjustment in the amount of $536,128.08 submitted by L.S. Womack, Inc. a subcontractor of Petrofac, Inc.; and
6. Specified claims in full and precise amounts to be received by the Subcontract Manager within ninety (90) calendar days from the issuance of final acceptance by the Subcontract Manager.

its Construction Industry Arbitration Rules (AAA Rules).

Petrofac subsequently filed its demand for arbitration. In June 2008, Petrofac provided DM the report of its damages expert, Frank Adams. The Adams report calculated Petrofac's damages using a different methodology and reached a different amount than the original REA. The arbitration began in March 2009. After five days of hearings, however, the arbitration panel recessed for seven months. When the arbitration reconvened, DM objected to the arbitration panel hearing any claims stemming from the different damages methodology used in the Adams report, claiming that it effectively created a new constructive change claim outside the parties' agreement to arbitrate.

The arbitration panel dismissed DM's objection because "the arbitration agreement is clear and encompasses all of the issues between the parties arising out of this contract. It is also clear that DM waived any objection it had to the arbitration of a constructive change claim." The arbitration panel subsequently awarded Petrofac damages for the "contract balance, damages for a constructive change to the contract, an award for the benefit of Womack, and interest from August 24, 2006 to July 26, 2010" to be paid "within thirty days of the Award."

The district court confirmed the award. The district court rejected DM's argument that the REA and the Adams report represented different claims. Therefore, the district court ruled that the arbitration panel did not exceed its authority by awarding damages as presented in the Adams report. The court also determined that the award was not procured through fraud or undue means under 9 U.S.C. § 10(a)(1). Finally, the district court ordered prejudgment interest after August 26, 2010, ruling that prejudgment interest recommenced after DM failed to pay the award within the thirty-day period.

## II.

This court reviews "a district court's confirmation of an award *de novo*, but the review of the underlying award is exceedingly deferential." *Apache Bohai*

*Corp. LDC v. Texaco China BV*, 480 F.3d 397, 401 (5th Cir. 2007) (internal quotation marks omitted).

### A.

On appeal, DM argues that the arbitration panel exceeded its powers by issuing an award on a claim not covered by the parties' arbitration agreement. 9 U.S.C. § 10(a)(4) (allowing a district court to vacate an award "where the arbitrators exceeded their powers"). Specifically, DM contends that the calculations in the expert report were extinguished by the 2005 release and therefore fall outside the parties' agreement to arbitrate. Petrofac responds that the parties contracted for the arbitration panel (and not the courts) to decide this question of arbitrability, and even if the arbitration panel did not have the power to decide arbitrability, the district court properly determined that the claims at issue were within the arbitration agreement.

We first consider if the arbitration panel properly determined the initial question of arbitrability, i.e. whether the claim is within the parties' agreement to arbitrate. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (internal citations omitted). We will not assume that the parties agreed to arbitrate arbitrability "[u]nless the parties clearly and unmistakably provide otherwise." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Accordingly, we must decide if DM and Petrofac "clearly and unmistakably" provided for the arbitration panel to decide arbitrability.

Here, the parties expressly incorporated into their arbitration agreement the AAA Rules. These rules state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." We agree with most

of our sister circuits that the express adoption of these rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) ("[W]e conclude that the arbitration provision's incorporation of the AAA Rules . . . constitutes a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator."); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1372–73 (Fed. Cir. 2006) (same); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005) (same); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (same); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989) (same result under the similar ICC Rules). *But see Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 780 (10th Cir. 1998).[2]    Therefore, the arbitration panel properly made the decision that the damages calculations in the Adams report fell within the agreement to arbitrate.[3]

## B.

Next, DM contends that Petrofac procured the overtime premium portion of the award through fraud or undue means.  9 U.S.C. § 10(a)(1) (permitting the district court to vacate an award "where the award was procured by corruption, fraud, or undue means").  Among the many claims brought in the original REA, Petrofac brought two distinct claims for damages: (1) an overtime premium claim for the additional overtime on the degas project; and (2) a claim for DM's impact

---

[2] Today's holding complies with our own prior suggestions that the incorporation of the AAA Rules "may be sufficient to show that the parties to those agreements intended to confer that power on the arbitration panel." *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 n.9 (5th Cir. 2011) (emphasis omitted).  Also, while the Texas Supreme Court has not weighed in on the issue, Texas appellate courts have adopted the same approach. *See Schlumberger Tech. Corp. v. Baker Hughes, Inc.*, 355 S.W.3d 791, 802–03 (Tex. App.–Houston [1st Dist.] Oct. 12, 2011).

[3] Although DM characterizes its contracts as narrow arbitration agreements for only a few preserved disputes, nothing limits the parties' broad agreement to arbitrate "all claims and disputes" that related to the subcontract.  Indeed, the 2006 arbitration agreement covered all disputes "including but not limited to" those preserved in the 2005 release.

on other projects.[4]   Petrofac made a strategic decision to abandon the latter claim, while maintaining the former.  DM argues that Petrofac pulled a bait-and-switch by representing that it had abandoned its impact on other jobs claim, but then slipped those damages back in through its overtime premium claim.  Rather than a covert legerdemain hidden from the arbitration panel, DM thoroughly advocated these arguments to the arbitration panel (both before and during the arbitration) and to the district court.  In each case, the arbitration panel or court rejected DM's arguments.  *See Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022–23 (5th Cir. 1990) (reversing a district court's vacatur of award where the arbitration panel heard evidence of the fraud and ruled it immaterial).  Having examined the record, we conclude that DM's allegation of fraud misunderstands the distinct nature of Petrofac's claims.

## C.

Finally, DM argues the district court committed reversible error by ordering prejudgment interest.  "Texas law governs the award of prejudgment interest on the [arbitration] award," and "[u]nder Texas law, prevailing parties receive prejudgment interest as a matter of course."  *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1329 (5th Cir. 1994).  On July 26, 2010, the arbitration panel ruled that Petrofac was entitled to interest, calculated the amount of interest as of the date of the award, and ordered payment of "interest from August 24, 2006 to July 26, 2010, within thirty days of the Award."  DM did not pay within the required thirty-day period.  The district court ordered that DM pay additional interest, reasoning that by ordering payment by August 25, 2010, the arbitration panel created "a thirty-day interest-free window from the date of the award," and DM "is not permitted to discount the arbitration panel's

---

[4] Under the overtime claim, Petrofac sought to recover the amount of overtime paid to employees who were billed on other projects but, because of DM's disruption, needed to work overtime *on the degas project*.  Under the impact on other projects claim, Petrofac demanded damages because DM's disruption of the degas project required Petrofac to hire additional subcontractors and pay overtime for work *on two other projects* to keep them on schedule.

award by recalcitrantly delaying payment." We agree. The district court properly reinstated the arbitration panel's interest award after DM refused to pay within the required period.[5]

## III.

The district court properly confirmed the arbitration panel's arbitration award. On appeal, DM has failed to demonstrate reversible error. Consequently, the judgment of the district court is AFFIRMED.

---

[5] The arbitration panel's award of interest—and order that it be paid within thirty days—distinguishes this case from others where the arbitration panel decided not to award interest to the prevailing party. *See Glover v. IBP, Inc.*, 334 F.3d 471, 477 (5th Cir. 2003).