# United States Court of Appeals
## For the First Circuit

Nos. 14-1376; 14-1377

THE FPE FOUNDATION,

Plaintiff, Appellant/Cross-Appellee,

v.

LEWIS COHEN, as co-trustee of the Qualified Terminable Interest
Property Trust,

Defendant, Appellant/Cross Appellant,

MARTIN P. SOLOMON, as co-trustee of the Qualified Terminable
Interest Property Trust;  BETSY A. SOLOMON, as trustee of the
LLLB Trust; J. ROBERT CASEY; BETSY A. SOLOMON and MARTIN P.
SOLOMON, as co-trustees of the Cohen-Solomon Family Foundation,

Defendants, Appellees/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon George A. O'Toole, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Souter,* Associate Justice,
and Lipez, Circuit Judge.

Joseph D. Whelan, with whom Matthew H. Parker and Whelan,
Kinder & Siket LLP were on brief, for cross-appellee FPE
Foundation.
Sean T. Carnathan, with whom O'Connor Carnathan and Mack, LLC

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

was on brief, for cross-appellant Lewis C. Cohen.

Robert S. Frank, Jr., with whom Anita M.C. Spieth and Choate, Hall & Stewart LLP were on brief for appellee Robert Casey.

Rosanna Sattler, with whom James E. Kruzer and Posternak Blankstein & Lund LLP were on brief, for appellees Martin P. Solomon, as co-trustee of the Qualified Terminable Interest Property Trust, and Betsy A. Solomon and Martin P. Solomon, as co-trustees of the Cohen-Solomon Family Foundation.

———————————

September 2, 2015

———————————

**HOWARD, Chief Judge**.  Federal court involvement in this case turns on whether an arbitration clause in a trust agreement applies to the claims asserted here and whether the appellees have waived their right to arbitration.  Concluding that there had been no waiver, and that all of the counts were arbitrable, the district court dismissed the action.  Agreeing with both conclusions, we affirm.

## I.

The litigation resulting in these consolidated appeals stems from disputes within the Cohen family.  At the top of that family tree were Maurice and Marilyn Cohen.  They were married and had two children: Lewis and Betsy.  Betsy eventually married Martin Solomon, another lead in this saga.

In 1989, Maurice created the Maurice M. Cohen Revocable Trust ("Maurice Trust").  After he died in 1995, assets from the trust were passed to a Qualified Terminable Interest Property Trust ("QTIP Trust") and to a charitable organization, the Fund for Philanthropy and Education ("Fund").  Lewis and Martin, co-trustees of the Maurice Trust, the QTIP trust, and the Fund, were tasked with distributing the income and principal of the QTIP Trust to Marilyn during her lifetime.  J. Robert Casey served as an advisor to the co-trustees with respect to the QTIP Trust.

In 2010, Marilyn died.  At this point, pursuant to the terms of the Maurice Trust, all remaining assets of the QTIP Trust

rolled over to the Fund. Disputes quickly emerged between Lewis and Martin respecting the administration of the Fund. In September 2010, the two trustees signed a settlement agreement pursuant to which roughly half of the Fund's assets were to be given to a new charity managed by Betsy -- the C-S Foundation ("C-S"). Martin was to then resign as co-trustee of the Fund, leaving Lewis to manage the Fund and its successor, the FPE Foundation ("FPE").

In addition to quarreling over the Fund, the parties began tussling over yet another trust (one that Marilyn had created during her lifetime: the "Marilyn Trust"). This dispute sparked a lawsuit by Betsy and Casey against Lewis in July 2011 in the Suffolk County Probate and Family Court ("Suffolk suit"), along with a nearly identical case that Lewis initiated against Betsy and Casey in the Norfolk Division of the Superior Court of Massachusetts ("Norfolk suit").

Lewis subsequently expanded the scope of the Norfolk suit. Specifically, he argued that the trustees of the QTIP Trust (himself included) distributed assets from it to Marilyn in violation of their authority. Lewis added FPE (which he manages) as a defendant. FPE then counter-claimed, contending that any improper transfer was to the detriment of its remainder interest.

The Norfolk suit was eventually dismissed, and FPE (again, remember, managed by Lewis) thereafter filed the present federal case against Martin, Lewis, Betsy, and Casey. Similar to

-4-

its counter-claim in the Norfolk suit, FPE alleged that Lewis and Martin exceeded their powers as co-trustees of the QTIP Trust. FPE further claimed that Casey breached his fiduciary duty to that trust. Lewis cross-claimed against Casey, seeking contribution and indemnity, and accusing him of legal malpractice.[1]

In 2013, C-S intervened in the federal case and counter-claimed against FPE. C-S pointed to the 2010 settlement agreement and argued that it was the rightful successor-in-interest to the Fund. Accordingly, C-S insisted that it was entitled to at least half of any damages that FPE might recover.

As C-S entered the case, the defendants (sans Lewis) lobbied for a way out. They filed a motion to dismiss and to compel arbitration. Relying on an arbitration clause contained in the Maurice Trust, the district court allowed the motion.

Lewis and FPE timely appealed.

## II.

We review a district court's decision to enforce an arbitration clause, de novo. Gove v. Career Sys. Dev. Corp., 689 F.3d 1, 4 (1st Cir. 2012).

Two discrete issues are presented. First, Lewis maintains that the other defendants waived their right to

---

[1] Although Betsy remains involved in this case as a co-trustee of C-S, she was also originally a defendant as co-trustee of yet another entity. The claims related to that trust are not at issue in this appeal.

-5-

arbitration, and thus dismissal was inappropriate. Second, FPE contends that C-S's counter-claim is not subject to the arbitration clause in the Maurice Trust. We address each in turn.

**i.**

We begin with Lewis' claim that the defendants waived their right to arbitration. He believes that their actions in the prior state court litigation amounted to a conduct-based waiver. He thus contends that his cross-claim against Casey should remain in federal court and, since that claim is inexorably linked with FPE's central counts, those claims must also stay.

At the outset, we note that our analysis would normally begin by asking whether a valid arbitration clause exists, whether the movant is entitled to invoke the clause, whether the non-moving party is bound by it, and whether the clause covers the claims asserted. See Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011). Only then would we consider whether a party has waived such a right. Here, we have serious doubts as to whether Casey, as a mere advisor and counselor to QTIP, was ever entitled to invoke the arbitration clause. But, Lewis has failed to argue that the agreement is otherwise unenforceable and we therefore soldier on. See United States v. Oladosu, 744 F.3d 36, 39 (1st Cir. 2014) ("Because the argument is underdeveloped, it is waived.").

Although a party may waive a right to arbitrate -- either explicitly or through its conduct -- we resolve any doubts in favor of arbitration. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26 (1983). Such an approach is consistent with a liberal federal policy favoring arbitration. See AT&T Mobility, LLC v. Concepcion, 131 S.Ct. 1740, 1745 (2011). A number of considerations guide our waiver inquiry. These factors include: (1) whether the parties participated in a lawsuit or took other action inconsistent with arbitration; (2) whether the "litigation machinery has been substantially invoked and the parties [are] well into preparation of a lawsuit by the time an intention to arbitrate [is] communicated"; (3) "whether there has been a long delay" and trial is near at hand; (4) whether the party seeking to compel arbitration has "invoked the jurisdiction of the court by filing a counterclaim"; (5) whether discovery not available in arbitration has occurred; and, (6) whether the party asserting waiver has suffered prejudice. Restoration Preservation Masonry v. Grove Eur. Ltd., 325 F.3d 54, 60-61 (1st Cir. 2003) (citations omitted).

Lewis points to the two state court actions as evidence of a conduct-based waiver. He begins with the Suffolk Suit, about which some additional background is necessary.

Before the Suffolk suit was initiated, Lewis insisted that certain amendments to the Marilyn Trust were improper as she allegedly lacked testamentary capacity at the time of the relevant

changes. In response, in July 2011, Betsy and Casey (both were also co-trustees of the Marilyn Trust) filed the Suffolk Suit, seeking a declaratory judgment respecting the validity of the amendments. Betsy also filed a cross-claim respecting an entirely separate trust (the Cohen Florence Nominee Trust). Lewis moved to dismiss the Suffolk suit, but the court denied his motion.

In our case, Lewis avers that the defendants waived any right to arbitrate because they instituted and maintained the Suffolk litigation. In taking this position, however, Lewis ignores the substantive differences between the Suffolk counts and the federal claims now at issue. Critically, neither of the instruments at issue in the Suffolk suit included an arbitration clause. In fact, had the Suffolk plaintiffs initially sought to arbitrate those claims, Lewis could have been at the court's door seeking to block that move. And, since those claims were not subject to any arbitration provision, a court would have likely agreed. See McCarthy v. Azure, 22 F.3d 351, 354-55 (1st Cir. 1994) ("Thus, a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate *some* claims.").

Admittedly, as Lewis suggests, the claims here do tangentially relate to the counts asserted in the Suffolk suit, since the disposition of the federal claims could affect the property held in the Marilyn Trust. But, even assuming that the

overlap somehow rendered the Suffolk claims arbitrable, the Suffolk plaintiffs' failure to insist upon arbitration for those counts would not constitute a waiver as to the specific, discrete claims alleged in this federal case. Indeed, "[o]nly prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate." 1 Domke on Commercial Arbitration § 23:6 (2014). This is true even "where a party has previously litigated an unrelated yet arbitrable dispute." Id. (citing Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 133 (2d Cir. 1997)); accord Microstrategy, Inc. v. Lauricia, 268 F.3d 244, 250 (4th Cir. 2001). Simply put, no such overlap respecting the claims exists in this case. As such, the Suffolk suit does not provide any justification for a waiver finding here.

Finding no luck in Suffolk, Lewis turns to the Norfolk suit. That case began roughly three months after the commencement of the Suffolk case. At that time, Lewis filed a complaint in Norfolk, largely mirroring his answer and arguments in the Suffolk suit. Relying on the pendency of the Suffolk suit, the defendants in the Norfolk action (Betsy and Casey as co-trustees of the Marilyn Trust), moved to dismiss under Mass. R. Civ. P. 12(b)(9) (permitting dismissal when there is a prior, pending action in a Commonwealth court).

In response to that motion, Lewis amended his complaint to assert claims related to the Maurice Trust. For the first time,

-9-

he argued that the trustees (himself included) distributed assets from QTIP to Marilyn in violation of their authority.  He then added FPE as a defendant, which, as previously highlighted, counter-claimed.

Betsy and Casey did not answer these new claims. Instead, they rested on their previously-filed motion to dismiss. They did note that they would not "object to the addition to the Suffolk Probate case of parties from the Norfolk case or claims made in the Norfolk case."  The Norfolk court eventually dismissed the case, and FPE voluntarily withdrew its claims.

Lewis now maintains that the Norfolk defendants' failure to insist on arbitration following his initial (and amended) complaint, constitutes waiver.  This is particularly true, he argues, since the defendants "chose to persuade [the courts] to dismiss Lewis' complaint, arguing successfully that the matter should be heard in probate court."  More concretely, he highlights statements made in the Norfolk litigation, which he alleges establish that the Norfolk defendants agreed to eschew any future jurisdictional defenses that they might have otherwise had.

Both the facts and law undercut Lewis' position. Lewis' initial complaint in Norfolk overlapped with the issues in his Suffolk answer.  Thus, for the same reasons that the Suffolk suit cannot ground a waiver finding, the Norfolk defendants' failure to

insist on arbitration in response to the initial complaint does not constitute a waiver as to the federal counts.

It is true that Lewis amended his Norfolk complaint to assert the QTIP issues at the heart of this federal case. Following the amendment, however, the Norfolk defendants took no further action which would have churned the "machinery of litigation." Instead, they merely relied on their previously-filed motion to dismiss. Even if, arguendo, they had submitted a new motion, such a filing would still have been a far cry from the type of action that we have deemed sufficient to constitute a conduct-based waiver. See Creative Solutions Grp., Inc. v. Pentzer Corp., 252 F.3d 28, 33 (1st Cir. 2001) (finding no waiver where the defendant filed a motion to dismiss and a single request for production); J & S Constr. Co. v. Travelers Indem. Co., 520 F.2d 809, 809-10 (1st Cir. 1975) (no waiver where the defendant waited 13 months to request arbitration and actively participated in discovery); contra Joca-Roca Real Estate, LLC v. Brennan, 772 F.3d 945, 948 (1st Cir. 2014) (finding waiver where "the plaintiff commenced a civil action, vigorously prosecuted it, and then - after many months of active litigation - tried to switch horses midstream to pursue an arbitral remedy.").

To the extent that Lewis relies on the defendants' statements in the Norfolk litigation, that argument also has no legs. Specifically, the Norfolk defendants asserted that they

would not raise any jurisdictional claims if the issues related to QTIP were all joined in the Suffolk probate court litigation. Had Lewis and FPE responded to the Norfolk dismissal by asserting these claims in the Suffolk suit, and had the (federal) defendants responded by insisting upon arbitration, Lewis' argument would be compelling. But, since Lewis and FPE essentially rejected the Norfolk defendants' offer to resolve the entire dispute in Suffolk by filing this federal suit instead, the remaining defendants are entirely within their rights to now insist upon arbitration. Ultimately, we can discern no conduct in either suit that suggests that the defendants waived their right to arbitration.

Even assuming that there were some conduct suggestive of waiver, though, Lewis has also failed to show any prejudice. As we have consistently said, "prejudice is essential for a [finding of] waiver" even though the showing of prejudice can be "tame at best." Id. at 949 (internal quotation marks and citation omitted). Here, we are unable to find, for example, any "delay [that] was protected" or "litigation-related activities [that] were copious." Id. at 950. A finding of waiver would thus still be inappropriate, and the district court did not err in reaching that conclusion.[2]

---

[2] Lewis also lobs a judicial estoppel argument that is largely cut from the same cloth as his waiver contention. Even evaluating the argument independently though, it fails for two reasons. First, Lewis did not present the argument to the district court and thus it "cannot be broached for the first time on appeal." Teamsters, Chauffeurs, Warehouseman & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17,21 (1st Cir.

The second issue in this appeal is whether C-S's counter-claim is subject to arbitration.  That, in turn, hinges on whether C-S's assertions are governed by the Maurice Trust or the 2010 settlement agreement.  On this question, we conclude that C-S's claim fundamentally boils down to whether the terms of the Maurice Trust entitled it, as a successor-in-interest to the Fund, to certain assets of the QTIP trust.

To set the stage, Maurice utilized broad language when crafting his trust agreement.  It noted that "[a]ny controversy or claim arising out of or relating to this trust agreement, or the breach thereof, shall be settled by arbitration."  Meanwhile, the settlement agreement stated that "the Commonwealth of Massachusetts shall have exclusive jurisdiction over any action related to, or arising out of, this Agreement."

Whether an arbitration clause covers a specific claim is initially a question of state contract law, although we invoke a presumption in favor of arbitration where the clause is "ambiguous about whether it covers the dispute at hand."  Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 379 (1st Cir. 2011).  Here, the Maurice Trust is governed by Florida law, which also has

1992).  Second, even were we to consider the merits of the estoppel claim, Lewis has not shown that the other defendants took an inconsistent position in an earlier case, or that any court ever accepted such an earlier, irreconcilable argument.  See Healey v. Spencer, 765 F.3d 65, 76-77 (1st Cir. 2014).

a strong public policy favoring arbitration.  See 13 Parcels LLC v. Laquer, 104 So.3d 377, 380 (Fla. Dist. Ct. App. 2012).

FPE's central theory is that C-S's counter-claim derives exclusively from the parties' 2010 settlement agreement.  As a result, it argues that the "arise under" and "relate to" language in the Maurice Trust simply does not apply to C-S's claims.  Thus, according to FPE, the forum selection clause of the settlement agreement -- calling for resolution in Massachusetts state courts -- must be given full effect.[3]

Florida takes a broad view of the phrase "relates to" in the context of a forum selection clause.  Under that state's law, "relates to" merely requires a "significant relationship" between the claim asserted and the contract containing the arbitration provision.  See Jackson v. Shakespeare Found., Inc., 108 So.3d 587, 593 (Fla. 2013).  This requires a "contractual nexus" which exists when "the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract."  Id.

Here, it is helpful to clarify the contours of C-S's counter-claim.  C-S does not contend that FPE somehow breached the settlement agreement or that FPE acted in a manner entitling C-S to

---

[3]  Although the parties do not argue it, we find it curious that FPE has invoked the forum selection clause, but failed to actually argue for its enforcement by, for example, demanding dismissal of the counter-claim in favor of the Massachusetts state courts.

-14-

recover. Instead, it _is_ arguing that, as provided in the settlement agreement, it is a successor-in-interest to the Fund established by the Maurice Trust and thus, like FPE, has a direct, financial interest in any moneys that should have been passed to the Fund. To the extent that the QTIP trustees exceeded their power, it was to the direct detriment of C-S's pecuniary interest. Thus, if FPE recovers anything on that claim, C-S insists that it, too, is entitled to share in the recovery.

Accordingly, C-S's claim unquestionably "relates to" the Maurice Revocable trust. C-S asserts that it is entitled to recover based on mismanagement of QTIP -- a legal theory that hinges entirely on the powers provided to the QTIP trustees. Those powers, in turn, are _defined_ in the Maurice Trust Agreement, and thus require an interpretation of that document. Although the settlement agreement may have established C-S as successor-in-interest of the Fund, the specific claim that it brings here relates solely to the Fund's rights to assets of the QTIP trust as governed by the terms of the Maurice Trust.

Attempting to avoid that straightforward conclusion, FPE protests that even if the claim is "related to" the Maurice Trust, the 2010 settlement agreement amended that instrument with respect to any claim that also "relates to" or "arises from" the settlement agreement. FPE leans heavily on two cases to broadly profess that parties are free to revoke or amend an earlier arbitration

-15-

agreement by establishing an alternative dispute resolution for specific claims.  See Applied Energetics, Inc. v. Newark Capital Mkts., LLC, 645 F.3d 522 (2d Cir. 2011); Nat'l R.R. Passenger Corp. v. ExpressTrak LLC, 330 F.3d 523 (D.C. Cir. 2003).  It then notes, as in those cases, that the 2010 settlement agreement contained a "merger clause."

As an initial matter, this claim ignores the hurdles that the law imposes on parties seeking to amend an irrevocable trust.  In Florida, "[o]nce created, a valid trust cannot be altered, amended, or revoked except by the exercise of a power identified in the trust."  L'Argent v. Barnett Bank, N.A., 730 So. 2d 395, 397 (Fla. Dist. Ct. App. 1999).  Other than Section VIII of the trust (a section which preserved the grantor's right to make certain changes), the parties have not pointed to any provision that permitted amendments following Maurice's death.  Thus, an amendment could only take place with the unanimous consent of all of the qualified beneficiaries and trustees, which was never obtained here.  Fla. Stat. § 736.0412 (2014).

Nor do the cases that FPE cites actually cut in its favor.  Both Applied Energetics and ExpressTrak involved multiple agreements between the same parties.  In each, there was a clear intent to amend the initial document through a subsequent one.  Indeed, in Applied Energetics, the parties' latter agreement was simply a formalized version of an earlier, preliminary contract.

645 F.3d at 523. While the initial document included an arbitration clause, the second one changed it to a forum selection clause. Id. In that circumstance, the Second Circuit reasonably concluded that the language of both was "all-inclusive, both [were] mandatory, and neither admits the possibility of the other." Id. at 526.

In this case, however, the settlement agreement and its merger clause had a more constrained purpose. As the agreement makes clear, the parties were resolving a dispute over the management of the Fund in an effort to prevent litigation respecting that entity. The merger clause merely indicated that the final agreement became the sole governing document resolving that specific dispute. Notably absent was any indication that the settlement agreement sought to alter the Maurice Trust agreement. Thus, even if the parties could have amended the Maurice Trust, a proposition we greatly doubt, there is nevertheless no evidence here that they sought to do so.

All told, C-S's claim is covered by the arbitration provision of the Maurice Trust and the 2010 settlement agreement did nothing to change that. Nonetheless, FPE attempts to make one final argument. It insists that we should still reject the arbitration provision in favor of the forum selection clause because the latter is a better fit with the federal claims at issue.

Contrary to FPE's argument, however, the forum selection clause does not imbricate with C-S's counter-claim. The settlement agreement's provisions concerning potential litigation establish that the forum selection clause is reserved for those claims respecting responsibilities or breaches of the settlement agreement itself. For instance, a section of the agreement addresses potential suits for breaches of warranties or representations made in the document. Certainly, the forum selection clause would be perfectly suitable for such a claim. But, this federal claim, as noted, does not fall into the same category. Instead, it turns exclusively on an interpretation of the powers delegated to the QTIP trustees -- powers established and governed by the Maurice Trust, not by the 2010 settlement agreement. This fact, when combined with the strong public policy favoring arbitration, see Concepcion, 131 S.Ct. at 1745, leads us to reject this final contention.

## III.

As a result of the arbitration provision in the Maurice Trust, federal court involvement in this case must come to an end. Accordingly, we **affirm** the district court's decision to dismiss the case and to compel arbitration.