KETTLE BLACK OF MA, LLC vs. COMMONWEALTH PAIN MANAGEMENT CONNECTION, LLC., 101 Mass. App. Ct. 109

 
 KETTLE BLACK OF MA, LLC vs. COMMONWEALTH PAIN MANAGEMENT CONNECTION, LLC.

101 Mass. App. Ct. 109
 December 13, 2021 - June 3, 2022

Court Below: Superior Court, Suffolk County
Present: Shin, Englander, & Hand, JJ.

 

No. 21-P-175.

Arbitration, Waiver. Federal Arbitration Act. Jurisdiction, Arbitration. Marijuana. Contract, Choice of law clause. Constitutional Law, Commerce clause, Interstate commerce. Interstate Commerce.

In a civil action in which the plaintiff sought a declaration that the defendant had waived the right to arbitrate its claims concerning the transfer of $5.3 million in connection with a project to establish and operate registered marijuana dispensaries and cultivation facilities, a Superior Court judge did not err in entering judgment in favor of the plaintiff, where the business transactions underlying the defendant's operating agreement fell within the reach of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 et seq., and the choice of law provision in that operating agreement did not establish the intent required to displace the FAA [112-115]; where the waiver of arbitrability by litigation presumptively was a question for the court, not the arbitrator, to decide, and the arbitration provision in the operating agreement did not evince a clear and unmistakable intent to submit waiver of arbitrability by litigation to an arbitrator [115-118]; and where the defendant had waived the right to arbitrate its claims as a result of its litigation conduct in a previous related lawsuit, i.e., its initiation of a third-party derivative claim against the plaintiff and its delay in initiating arbitration proceedings for seven months after the third-party derivative claim was dismissed [118-121].

Civil action commenced in the Superior Court Department on August 26, 2020.

 The case was heard by Janet L. Sanders, J.

 Christopher H.M. Carter for the defendant.

 Nicholas Ramacher for the plaintiff.

 HAND, J. This declaratory judgment action arose out of arbitration proceedings commenced by the defendant, Commonwealth Pain Management Connection, LLC (CPMC), against the plaintiff, Kettle Black of MA, LLC (Kettle Black). Following commencement of the arbitration proceedings, Kettle Black brought this action in the Superior Court seeking a declaration that CPMC 

 Page 110 

waived the right to arbitrate its claims. A judgment entered in Kettle Black's favor. CPMC appeals, and we affirm.

 Background. In or around September 2015, CPMC, Kettle Black, and their managers, Frederick McDonald and Terence Fracassa, participated in a project to establish and operate registered marijuana dispensaries and cultivation facilities in Massachusetts. The project was designed to be structured as follows: Kettle Black, of which McDonald was a manager, would raise capital for the project and hold a forty percent membership interest in CPMC; CPMC, of which McDonald and Fracassa were both managers, would enter into a long-term service contract with a nonprofit entity named Wellness Connection of MA, Inc. (Wellness); and Wellness would be licensed to operate the dispensaries and cultivation facilities. CPMC's amended and restated operating agreement [Note 1] (operating agreement) included an arbitration provision that stated as follows:

"The parties [Note 2] hereby agree that unless otherwise specifically required by law, any and all disputes, and legal and equitable claims arising between or among the Members, the Managers, the officers, [CPMC], or any of them or any combination of them, which relate to the rights and obligations of such Persons under the terms of this Agreement . . . shall be submitted to binding arbitration in the Commonwealth of Massachusetts, in accordance with the commercial rules of the American Arbitration Association."

 The project was short lived. While Kettle Black raised approximately $8 million from its investors and used that money to purchase a membership interest in CPMC, disputes arose between various people involved with the project, and the project did not move forward. In December 2016, McDonald (manager of both CPMC and Kettle Black) transferred approximately $5.3 million from CPMC to Kettle Black; some, if not all, of that money was distributed back to the Kettle Black investors.

 With the project's demise came various legal proceedings. As pertinent here, in December 2017, some of the Kettle Black investors brought an action in the Superior Court against McDonald 

 Page 111 

and Fracassa alleging that they withheld information from or misrepresented information to the Kettle Black investors (investors' lawsuit). Over one year into that litigation, in April 2019, Fracassa brought a third-party derivative claim -- on CPMC's behalf -- against Kettle Black, alleging that Kettle Black improperly transferred the $5.3 million from CPMC to Kettle Black. In July 2019, Kettle Black moved to dismiss the third-party derivative claim; in December 2019, that motion was allowed on the basis that "there [was] no allegation . . . that [Kettle Black] played any part in the transfer of these funds." [Note 3]

 That brings us to the crux of this declaratory judgment action: the arbitration proceedings. In July 2020, more than one year after Fracassa initiated the third-party derivative claim on behalf of CPMC in the Superior Court, CPMC initiated arbitration proceedings by filing a four-count arbitration demand against Kettle Black and McDonald; all four counts were based on the transfer of the $5.3 million from CPMC to Kettle Black. Kettle Black responded to the arbitration demand by filing this declaratory judgment action. Kettle Black alleged that CPMC waived the right to arbitrate its claims as a result of its litigation conduct in the investors' lawsuit, including the initiation of the third-party derivative claim, which was essentially the same claim (on behalf of CPMC and against Kettle Black) that CPMC was now seeking to arbitrate. [Note 4] CPMC moved to dismiss Kettle Black's declaratory judgment action, arguing that whether it had waived its right to arbitrate its claims was a question for the arbitrator to decide. Kettle Black opposed CPMC's motion to dismiss and moved for summary judgment. In an order addressing both motions, a Superior Court judge ruled in favor of Kettle Black, concluding that (1) Kettle Black's declaratory judgment action presented a question 

 Page 112 

for the court, not the arbitrator, to decide, and (2) CPMC, as a result of its litigation conduct, waived the right to arbitrate its claims. CPMC appeals from the judgment that followed.

 Discussion. 1. Choice of law. The parties dispute the law that governs the arbitrability of CPMC's claims. Relying on the arbitration provision contained in CPMC's operating agreement, which also contained a Delaware choice of law provision, CPMC argues that Delaware arbitration law governs. Kettle Black, on the other hand, argues that the business transactions underlying CPMC's operating agreement fell within the reach of the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (FAA), and that the FAA therefore governs. We conclude that the FAA governs for two reasons: (1) the parties' business transactions fell within the reach of the FAA, and (2) the choice of law provision in CPMC's operating agreement did not establish the intent required to displace the FAA.

 First, we address the reach of the FAA. In 1925, "Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'" Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 581 (2008), quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006). Accord National Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 79 (1st Cir. 2018). Consistent with this purpose, the United States Supreme Court has interpreted § 2 of the FAA broadly. The Supreme Court has noted that § 2 applies to written provisions in contracts evidencing transactions "involving commerce," and has held that "the word 'involving' is broad and is . . . the functional equivalent of 'affecting.'" Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273-274 (1995). Moreover, the word "affecting" is a word often used by Congress to signal its "intent to exercise its Commerce Clause powers to the full." Id. at 273. In short, the FAA's reach coincides with the scope of Congress's commerce clause power. See id. at 273-274.

 We thus look to the scope of Congress's commerce clause power, which is well established as broad. See National Fed'n of Indep. Business v. Sebelius, 567 U.S. 519, 549 (2012). The commerce clause extends beyond activities within the flow of interstate commerce, see Allied-Bruce Terminix Cos., 513 U.S. at 273, and "'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the 

 Page 113 

economic activity in question would represent 'a general practice . . . subject to federal control,'" Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56-57 (2003), quoting Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236 (1948).

 Applying these principles, we conclude that the business transactions underlying CPMC's operating agreement were well within the reach of the FAA and the scope of the commerce clause. Investors for the project came from various States, including Arizona, Florida, Massachusetts, and Rhode Island. See Rota-McLarty v. Santander Consumer USA, Inc., 700 F.3d 690, 697 (4th Cir. 2012), citing Jenkins v. First Am. Cash Advance of Ga., LLC, 400 F.3d 868, 874-875 (11th Cir. 2005), cert. denied, 546 U.S. 1214 (2006) (agreeing "with sister circuits, which have concluded that reliance upon funds from a foreign source in a transaction is sufficient to implicate the FAA"). Moreover, the purpose of the project was to establish and operate registered marijuana dispensaries and cultivation facilities, and the intrastate production and distribution of marijuana have been held to constitute economic activities "that in the aggregate substantially affect interstate commerce." Taylor v. United States, 579 U.S. 301, 307 (2016) (one "who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect [interstate] commerce"). See Citizens Bank, 539 U.S. at 56-57. These business transactions affected interstate commerce, and therefore fell within the reach of the FAA. [Note 5]

 Next, we address the choice of law provision. "[P]arties are free to contract around the application of the FAA in favor of state arbitration law[.]" Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 932 F.3d 1, 7 (1st Cir. 2019), citing Hall St. Assocs., L.L.C., 552 U.S. at 590. To displace the FAA with State arbitration law, the parties to an arbitration agreement must manifest the intent to do so, and the United States Supreme Court has concluded that a 

 Page 114 

standard choice of law provision, without more, does not establish the required intent. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 59, 62 (1995) (absent "contractual intent to the contrary, the FAA . . . pre-empt[ed]" New York law prohibiting arbitrators from awarding punitive damages; standard choice of law provision "[a]t most" introduced ambiguity on whether parties intended to displace FAA). See also Dialysis Access Ctr., LLC, supra at 8 ("general" choice of law provision insufficient to show that "parties explicitly agreed to . . . displace the FAA"); Cooper v. WestEnd Capital Mgt., L.L.C., 832 F.3d 534, 544 (5th Cir. 2016) (choice of law provision that did not reference State arbitration law insufficient "to demonstrate the parties' clear intent to depart from the FAA's default rules" [citation omitted]); Roadway Package Sys., Inc. v. Kayser, 257 F.3d 287, 288-289 (3d Cir. 2001), abrogated on other grounds by Hall St. Assocs., L.L.C., supra at 583 n.5 ("generic choice-of-law clause tells us little [if anything] about whether contracting parties intended to opt out of the FAA's default standards and incorporate ones borrowed from state law").

 Here, the choice of law provision required only that the operating agreement "be construed and enforced in accordance with the internal laws of the State of Delaware." This provision was separate and apart from the arbitration provision and was listed as a stand-alone provision under the "miscellaneous" section of CPMC's operating agreement. Moreover, the choice of law provision was a standard provision; it did not explain how it applied to the arbitration provision or even, for that matter, reference the arbitration provision. Given this context, the choice of law provision was ambiguous; it established that the parties intended Delaware contract law to govern disputes regarding the construction and enforcement of the operating agreement, but not that the parties intended Delaware arbitration law to govern disputes regarding the arbitrability of a claim. See Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1213 (9th Cir. 1998) ("general choice-of-law clauses do not incorporate state rules that govern the allocation of authority between courts and arbitrators"); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp., 88 F.3d 129, 134 (2d Cir. 1996) (rejecting argument that "standard New York choice-of-law clause[,] . . . on its own, [was] sufficient to incorporate New York decisional law on the allocation of powers between the court and the arbitrator"). We therefore agree with those other courts that have addressed similar standard choice of law provisions and conclude that the provision 

 Page 115 

here was insufficient to displace the FAA.

 2. Waiver of arbitrability by litigation. Applying the FAA, we turn next to whether waiver of arbitrability by litigation is for courts or arbitrators to decide. CPMC argues that waiver of arbitrability by litigation is presumptively for arbitrators to decide and that, alternatively, the parties here nevertheless agreed to submit the question to an arbitrator. Kettle Black argues that waiver of arbitrability by litigation is for courts to decide, and that contracting parties may not agree to submit the question to an arbitrator. We conclude that waiver of arbitrability by litigation is presumptively for courts to decide, and that the parties did not agree to submit the question to an arbitrator. We need not reach the question of whether the parties could have agreed to do so.

 Whether waiver of arbitrability by litigation is presumptively for courts or arbitrators to decide turns on whether the question is considered "procedural" or "substantive" under the governing case law. See BG Group PLC v. Republic of Argentina, 572 U.S. 25, 34-35 (2014). On the one hand, "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." Id. at 34. Procedural questions include whether "prerequisites such as time limits [and] notice" have been satisfied. Id. at 35, quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 85 (2002). On the other hand, "courts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about [substantive] arbitrability" (quotation omitted). BG Group PLC, supra at 34. Substantive questions include whether the parties are bound by an arbitration provision and whether the arbitration provision applies to the controversy at hand. See id.

 CPMC argues that waiver -- including waiver of arbitrability by litigation -- is a procedural question that is presumptively for arbitrators to decide. Guided by the Supreme Judicial Court's decision in Martin v. Norwood, 395 Mass. 159, 162 (1985), we disagree. In Martin, a case decided under the FAA, the court concluded that "[w]here . . . the issue of waiver turns on the significance of actions taken in a judicial forum, the issue is one for the court, rather than the arbitrator, to determine" (citation omitted). Id. We are not persuaded by CPMC's argument that under the United States Supreme Court's decisions in Howsam, 537 U.S. at 84, and BG Group PLC, 572 U.S. at 35, Martin is no longer good law. Both Howsam and BG Group PLC make passing 

 Page 116 

references to procedural questions, including allegations or claims of "waiver, delay, or a like defense to arbitrability" (citation omitted). BG Group PLC, supra. Neither case, however, involved an issue regarding a waiver, let alone a waiver of arbitrability by litigation. The issue in Howsam pertained to an arbitration rule that required disputes to be submitted to arbitration within six years; the Supreme Court concluded that compliance with the arbitration rule was a matter for arbitrators to decide. See Howsam, supra at 82, 85. BG Group PLC involved a similar question and conclusion regarding a timing rule. See BG Group PLC, supra at 28, 35.

 Most Federal circuit courts that have considered the above-quoted language in Howsam and BG Group PLC have concluded that it does not apply to waiver of arbitrability by litigation. See Martin v. Yasuda, 829 F.3d 1118, 1123 (9th Cir. 2016). As explained by the United States Court of Appeals for the First Circuit, there is a "long history" of courts deciding waiver of arbitrability by litigation, Marie v. Allied Home Mtge. Corp., 402 F.3d 1, 11-12, 14 (1st Cir. 2005); nothing in Howsam or BG Group PLC shows that the Supreme Court intended to disturb that history. There are also sound policy reasons why courts should decide waiver of arbitrability by litigation. First, the question implicates judicial concerns, such as whether a party is engaging in abusive forum shopping, which judges are "well-trained" to address. Marie, supra at 13. Second, "normally, the resolution of [waiver of arbitrability by litigation] would bar not only arbitration but any sort of litigation on the issues by either side." Id. at 14. [Note 6] We agree with the reasoning in Marie, and with the majority of other Federal circuit courts that have concluded that waiver of arbitrability by litigation is presumptively for courts to decide. [Note 7] See id. at 13-14. See also Martin, supra at 1123, and cases cited.

 Page 117 

 Nonetheless, CPMC also argues that the parties agreed to submit waiver of arbitrability by litigation to an arbitrator. [Note 8] "A shifting of [a substantive question of arbitrability] to the arbitrator will only be found where there is clear and unmistakable evidence of such an intent in the arbitration agreement" (quotation and citation omitted). Marie, 402 F.3d at 14. The arbitration provision here requires that disputes be submitted "to binding arbitration in the Commonwealth of Massachusetts, in accordance with the commercial rules of the American Arbitration Association." Rule 7(a) of those rules gives "[t]he arbitrator . . . the power to rule on . . . the arbitrability of any claim or counterclaim." [Note 9] The First Circuit, in addressing similar language, concluded that (1) "'[a]rbitrability' itself encompasses a variety of possible meanings, but the most obvious meaning focuses on certain substantive issues, and particularly the question of whether a particular kind of dispute at issue falls within the scope of [a valid] arbitration clause" and, in contrast, (2) "[w]e cannot say that the use of the term here evince[d] a clear and unmistakable intent to have waiver [of arbitrability by litigation] decided by the arbitrator." Marie, supra at 15. Accord Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207, 221-222 (3d Cir. 2007).

 We agree with the First Circuit's analysis and are unpersuaded by CPMC's reliance on language in other Federal circuit court opinions to the effect that incorporation of the American Arbitration Association's rules evinces a clear and unmistakable intent to have arbitrability decided by the arbitrator. See Petrofac, Inc. v. DynMcDermott Petroleum Operations Co., 687 F.3d 671, 675 (5th Cir. 2012), and cases cited. Those cases involved "question[s] of whether a particular kind of dispute at issue [fell] within the scope of [a valid] arbitration clause," Marie, 402 F.3d at 15, and therefore involved questions that fell within the connotation usually given to the word "arbitrability." Put simply, those cases did not involve the same sort of ambiguity present in Marie and 

 Page 118 

in this case. See, e.g., Blanton v. Domino's Pizza Franchising LLC, 962 F.3d 842, 844 (6th Cir. 2020), cert. denied, 141 S. Ct. 1268 (2021) (whether arbitration agreements were enforceable); Petrofac, Inc., supra at 674 (whether claim fell "outside" parties' agreement to arbitrate); Fallo v. High-Tech Inst., 559 F.3d 874, 876 (8th Cir. 2009) (whether arbitration provision "cover[ed]" tort claims); Terminix Int'l Co. v. Palmer Ranch Ltd. Partnership, 432 F.3d 1327, 1329 (11th Cir. 2005) (whether arbitration agreement was valid); Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 207 (2d Cir. 2005) (whether arbitration agreement existed).

 We conclude that the arbitration provision did not evince a clear and unmistakable intent to submit waiver of arbitrability by litigation to an arbitrator, and that the Superior Court judge was therefore correct to address the question. [Note 10]

 3. CPMC's waiver. The final issue on appeal is whether CPMC did, in fact, waive the right to arbitrate its claims as a result of its litigation conduct in the investors' lawsuit. Under the FAA, arbitration agreements are "[on] the same footing as other contracts," Morgan vs. Sundance, Inc., U.S. Supreme Ct., No. 21-328, slip op. at 6 (May 23, 2022), quoting Granite Rock Co. v. International Bhd. of Teamsters, 561 U.S. 287, 302 (2010), and are "as enforceable as other contracts, but not more so." Morgan, supra, quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n.12 (1967). See FPE Found. v. Cohen, 801 F.3d 25, 29 (1st Cir. 2015), citing Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26 (1983) (doubts as to waiver resolved in favor of arbitration). A number of factors guide this inquiry, including:

"(1) whether the parties participated in a lawsuit or took other action inconsistent with arbitration; (2) whether the litigation machinery has been substantially invoked and the parties [are] well into preparation of a lawsuit by the time an intention to arbitrate [is] communicated; (3) whether there 

 Page 119 

has been a long delay and trial is near at hand; (4) whether the party seeking to compel arbitration has invoked the jurisdiction of the court by filing a counterclaim; [and] (5) whether discovery not available in arbitration has occurred" [Note 11] (quotations omitted).

FPE Found., supra. [Note 12]

 We apply these factors to the circumstances surrounding CPMC's initiation of arbitration proceedings. As noted above, some of the Kettle Black investors brought an action against McDonald and Fracassa in December 2017. Over one year into the litigation, in April 2019, Fracassa brought a third-party derivative claim -- on CPMC's behalf -- against Kettle Black. Approximately eight months thereafter, in December 2019, the third-party derivative claim was dismissed. Not until seven months after that, in July 2020, did CPMC initiate arbitration proceedings against Kettle Black. These facts, as applied to the factors above, establish that CPMC waived the right to arbitrate its claims.

 The first, second, and fourth factors weigh in favor of waiver where Fracassa brought a third-party claim -- on CPMC's behalf -- against Kettle Black, [Note 13] thereby invoking the litigation machinery and the jurisdiction of the court. While CPMC argues that it was Fracassa, not CPMC, who brought the third-party claim against Kettle Black, this argument elevates form over substance: in substance, the third-party claim was a derivative claim that Fracassa brought on CPMC's behalf, and Fracassa set forth specific allegations supporting his ability to do so. Fracassa alleged that he was one of two managers of CPMC, that he was 

 Page 120 

the largest current shareholder of CPMC, that CPMC had become a "shell" as a result of the transfer of the $5.3 million, and that Fracassa was in a position to "fairly and adequately represent the interests of CPMC." And, while CPMC entered an appearance in the investors' lawsuit, at no point did it object to Fracassa asserting a derivative claim on its behalf. As succinctly stated by the Superior Court judge, "[i]t cannot be seriously disputed that Fracassa is CPMC."

 The third factor of delay also weighs in favor of waiver where the investors' lawsuit was brought in December 2017; the third-party derivative claim brought on CPMC's behalf was brought in April 2019; and CPMC did not initiate arbitration proceedings until July 2020, several months after the third-party derivative claim had been dismissed. CPMC's delay in requesting arbitration -- particularly CPMC's failure to do so until after the third-party derivative claim had been dismissed -- gives the strong appearance of forum shopping. Even if that were not the case, the significant delay in and of itself weighs in favor of waiver. See Jones Motor Co. v. Chauffeurs, Teamsters & Helpers Local Union No. 633 of N.H., 671 F.2d 38, 43 (1st Cir.), cert. denied, 459 U.S. 943 (1982) ("to require that parties go to arbitration despite their having advanced so far in court proceedings before seeking arbitration would often be unfair, for it would effectively allow a party sensing an adverse court decision a second chance in another forum").

 As to the fifth factor -- whether discovery not available in arbitration has occurred -- CPMC argues that Kettle Black did not provide any discovery related to the third-party derivative claim and that, moreover, any such discovery would have been available in arbitration. CPMC asserts, without citing to any particular rule, that the commercial rules of the American Arbitration Association "allow for broad discovery, including depositions." Nonetheless, where the other factors weigh in favor of waiver, we assume for our review that this factor weighs against waiver.

 Where the factors in FPE Found., 801 F.3d at 29, [Note 14] overwhelmingly weigh in favor of waiver, we agree with the Superior Court judge's conclusion that CPMC waived the right to arbitrate its 

 Page 121 

claims as a result of its litigation conduct in the investors' lawsuit.

 Judgment affirmed.

FOOTNOTES
[Note 1] The amended and restated operating agreement, dated September 2, 2015, was attached to the plaintiff's complaint, and it is on this version of the operating agreement that the parties have relied, both in the Superior Court and on appeal. 

[Note 2] The operating agreement applied to CPMC and "the parties set forth on the signature pages hereto," namely, Kettle Black, McDonald, and Fracassa. 

[Note 3] The judge who ruled on Kettle Black's motion to dismiss did not think McDonald's involvement in the transfer of funds was sufficient to state a claim against Kettle Black. The judge explained that McDonald had access to CPMC's bank account in his capacity as CPMC's manager, not as Kettle Black's manager, and that "having chosen not to sue McDonald, Fracassa cannot use the fact that McDonald also held a position in Kettle Black as a way to bootstrap a claim for conversion against Kettle Black." This ruling, and whether the judge properly dismissed the third-party derivative claim against Kettle Black, are not before us in this appeal, and we pass no judgment on those decisions. 

[Note 4] On appeal, Kettle Black does not contest that the underlying dispute over the $5.3 million transfer was one that arose "between or among the Members, the Managers, the officers, [CPMC], or any of them or any combination of them, which relate[d] to the rights and obligations of such Persons under the terms of [the] Agreement" and that it was therefore subject to the arbitration provision. 

[Note 5] CPMC's sole argument to the contrary, that the project's dispensaries and cultivation facilities were to be located in Massachusetts, is unpersuasive as the argument too narrowly focuses on whether the business transactions were in the flow of interstate commerce. Moreover, while this project's dispensaries and cultivation facilities were going to be located in Massachusetts, we note than an investment memorandum touted the project's associates as having "the greatest footprint in the New England area, with interests in as much as [seventy percent] of the medical marijuana market in Maine, approximately [fifty percent] of the cultivation and dispensary operations in [Rhode Island], dispensary operations in [Connecticut], and in Illinois." 

[Note 6] In light of the policy considerations favoring judicial resolution of waiver of arbitrability by litigation, we are not persuaded by CPMC's alternative argument that, where CPMC had already initiated arbitration proceedings, Kettle Black's filing of the declaratory judgment action represented an improper effort to interfere with pending arbitration proceedings. 

[Note 7] The sole Federal circuit court decision to the contrary is National Am. Ins. Co. v. Transamerica Occidental Life Ins. Co., 328 F.3d 462, 466 (8th Cir. 2003), which concludes, with no analysis, that Howsam requires all waiver issues to be submitted to the arbitrator. Other Federal circuit court decisions postdate that decision and decline to follow it. 

[Note 8] As noted above, we decline to reach Kettle Black's argument that waiver of arbitrability by litigation is one substantive question of arbitrability that contracting parties may not agree to submit to an arbitrator. 

[Note 9] A copy of the commercial rules of the American Arbitration Association was not included in the record, but CPMC's brief includes a hyperlink to where a copy may be found on the Internet. Kettle Black does not dispute that the linked copy contains the rules to which the parties agreed to be bound. See American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures. 

[Note 10] Even if the parties' dispute over the arbitrability of CPMC's claims were governed by Delaware law, we would reach the same conclusion. CPMC represented at oral argument that Delaware law largely follows the FAA, with one distinction: that some Federal courts have held that waiver of arbitrability by litigation is one substantive question of arbitrability that contracting parties may not agree to submit to an arbitrator. But, as discussed, we do not rely on that proposition. See note 8, supra. 

[Note 11] To the extent that Federal precedent, including decisions by the First Circuit, have also conditioned a finding of waiver on a showing of prejudice to the party asserting waiver, the Supreme Court has concluded that it did so in error. See Morgan, No. 21-328, slip op. at 7 ("Section 6 [of the FAA] instructs that prejudice is not a condition of finding that a party, by litigating too long, waived its right to stay litigation or compel arbitration under the FAA"). 

[Note 12] The parties dispute whether our review of the Superior Court judge's conclusion that CPMC waived the right to arbitrate is de novo or for an abuse of discretion. We need not resolve the question, as we agree with the Superior Court judge's conclusion under either standard. 

[Note 13] The fourth factor, specifically, is "whether the party seeking to compel arbitration has invoked the jurisdiction of the court by filing a counterclaim" (emphasis added; quotation and citation omitted). FPE Found., 801 F.3d at 29. While Fracassa, on CPMC's behalf, filed a third-party claim versus a counterclaim, the fact remains that he "invoked the jurisdiction of the court" (quotation and citation omitted). Id. 

[Note 14] Except, as we have noted, consideration of whether any delay by the party seeking arbitration prejudiced the opposing party. See Morgan, No. 21-328, slip op. at 7. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.