**Opinion issued March 6, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00847-CV

————————————

**BELFIORE DEVELOPERS, LLP, Appellant**

**V.**

**ELVIA BESIL SAMPIERI AND HAFFAN PROPERTIES, LLC, Appellees**

---

**On Appeal from the 334th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-44139**

---

## MEMORANDUM  OPINION

Belfiore Developers, LLP ("Belfiore") challenges the trial court's order, granting Elvia Besil Sampieri and Haffan Properties, LLC's motion to vacate an arbitration award.  In three issues, Belfiore contends that the trial court erred in vacating the award.

We reverse and render.

## Background

In February 2014, Belfiore began construction of Belfiore Condominiums, a 26-story luxury condominium building in Houston, containing 46 residential units. Belfiore developed the high-rise with the following purchaser in mind: wealthy people with large homes who want to downsize but still want adequate living space. Each condominium unit contains approximately 4,500 square feet of living area with an additional 700 square feet of terrace space. The condominiums have many high-end amenities, including 24-hour concierge and valet services and private elevator lobbies.

Buyers who can afford this type of high-end condominium want the ability to customize their home. For this reason, purchasers frequently buy high-end condominiums either before or during construction to allow them to work with designers and decorators to customize the unit. To allow for customization, Belfiore began selling units in the building in May 2013, nine months before construction on the high-rise building began.

On October 6, 2014, Elvia Besil Sampieri contracted with Belfiore to buy two condominium units, Unit 702 and Unit 1102. Sampieri signed a separate purchase contract for each unit. The purchase price for Unit 702 was $2,480,000, and the purchase price for Unit 1102 was $2,700,000.

The purchase contracts required Sampieri to pay 20 percent of the purchase price up front as an "Initial Payment." On October 17, 2014, Sampieri deposited the initial payments of $496,000 for Unit 702 and $540,000 for Unit 1102 with the title company designated in the purchase agreements. The initial payment for each property would be applied to the total purchase price, which was due at closing.

In Paragraph 17, entitled "Liquidated Damages/Default," the purchase contracts each provided,

> c. In the event of any default by Purchaser [Sampieri] under this Contract, Seller [Belfiore] may (i) terminate this Contract, in which event the Initial Payment shall be delivered to [Belfiore] as liquidated damages and not as a penalty because of the uncertainty and difficulty of ascertaining and measuring [Belfiore's] actual damages, and neither [Sampieri] nor [Belfiore] shall have any further rights or obligations under this Contract, (ii) enforce specific performance of this Contract, or (iii) seek damages or any other available remedies.

In August 2015, Sampieri entered into another contract with Belfiore, a "Construction Rider," pertaining to Unit 1102. Sampieri and her family planned to reside in Unit 1102, and the Construction Contract covered customized "build out" work for the unit. Sampieri agreed to pay $618,898 for the work. She initially paid Belfiore, $309,000, half of the agreed amount, but did not pay the remaining $309,000.

3

Construction of the high-rise condominium building was substantially completed in February 2016.[1] The closings for both Unit 702 and Unit 1102 were scheduled for March 10, 2016. However, Sampieri failed to close on the properties and failed to pay Belfiore the remainder of the purchase price for the condominium units.

On March 15, 2016, Belfiore notified Sampieri that she had defaulted on the purchase contracts by failing to pay Belfiore the remainder of the purchase prices for the two condominium units on the agreed closing date. In its notices, Belfiore informed Sampieri that it was terminating the purchase contracts and exercising its right to enforce the liquidated-damages provision found in Paragraph 17.c. Pursuant to this provision, Belfiore requested the title company to release Sampieri's initial payments of $496,000 and $540,000, which corresponded to 20 percent of each condominium's purchase price.

Sampieri disputed Belfiore's entitlement to the 20 percent initial payments being held by the title company, taking the position that the liquidated-damages provision contained in the purchase agreements was not enforceable. As a result of the dispute, the funds were not released by the title company to Belfiore.

---

[1] In February 2016, Sampieri assigned her interest in the purchase contracts to Haffan Properties, a company founded and owned by Sampieri. However, the assignment did not release Sampieri from her personal obligations under any of the contracts. Thus, because their interests are aligned, we refer to Haffan Properties and Sampieri collectively as "Sampieri."

To resolve the dispute, Sampieri filed a claim for arbitration as required by Paragraph 18 of the purchase agreements, which provides,

> 18. <u>Arbitration/Limitation of Claims</u>. All claims for breach of this Contract or otherwise are limited solely to the specific remedies provided for herein. Purchaser and Seller hereby further agree that any controversy, claim or dispute arising out of or relating to (a) this Contract, (b) any breach of this Contract, (c) the sales transaction reflected in this Contract, (d) the construction of the Unit which is the subject of this Contract, and/or (e) any representations or warranties, express or implied, relating to the Property and the Unit, may be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. All decisions by the arbitrators shall be final, and any judgment upon the award rendered by the arbitrators may be confirmed, entered and enforced in any court having proper jurisdiction. The decision of the arbitrators must be based on and consistent with Texas law (without regard to its conflicts of law), and all hearings and proceedings shall take place in Houston, Harris County, Texas. Any action, regardless of form, arising out of the transactions under this Contract must be brought by Purchaser within two (2) years of the date that the cause of action accrues.

The dispute was submitted to a three-member Arbitration Panel. After a three-day hearing, at which both sides offered witness testimony and documentary evidence, the Arbitration Panel rendered its written Arbitration Award.

In the Award, the Arbitration Panel wrote, "The purchase of each unit required a 20% deposit, which equated to $496,000 in the case of Unit 702 and $540,000 in the case of Unit 1102. The dispute in this matter centers around whether Belfiore is entitled to the 20% pursuant to the liquidated-damages clause contained in the contracts." The Panel recognized, "Counsel for both sides agree that, under Texas

law, for a liquidated damages provision to be enforceable (1) actual damages must [be] difficult to prove and (2) stipulated damages must be a reasonable estimate of the actual damages."

Citing to Texas case law, the Arbitration Panel offered the following evaluation of the evidence presented at the hearing:

5.9    [Sampieri] presented evidence intending to show that because Unit 1102 sold for $2,700,000.00 in December 2016, the actual damages were not difficult to calculated for that unit, and are, in fact certain.  [Sampieri] also introduced evidence to show what Unit 702 would reasonably have sold for, had it been properly marketed. However, evidence that a property sold at a later date for the same price or even at a profit is no evidence that a provision is an unreasonable stipulation as to contemplated charges.

5.10   [Sampieri] further introduced evidence to support their allegation that the amount of damages provided for by the liquidated damages clause was not a reasonable estimate of actual damages.

5.11   [Belfiore] responded with case law to support their position that the legal requirements to uphold a liquidated damages clause [(1) actual damages must [be] difficult to prove and (2) stipulated damages must be a reasonable estimate of the actual damages] are determined as of the date of the breach, which, in this case, was 10 March 2016.  The burden is on the party asserting the defense of penalty to demonstrate that the contractual provision is an unenforceable penalty rather than an enforceable liquidated damage provision.

5.12   Additionally, [Belfiore] provided evidence to support the actual damages incurred by [Belfiore] as a result of the failure to close by the [Sampieri].  These amounts roughly correlated to the 20% fee assessed by [Belfiore] and paid by [Sampieri] on October 17, 2014, thereby providing evidence that the stipulated damages in the liquidated damages clause is a reasonable estimate of the actual damages.

6

(Footnotes citing Texas case authority omitted.)

The Arbitration Panel determined that Belfiore "proved that [Sampieri] breached the contracts by failing to fund and close on 10 March 2016," and Sampieri "failed to prove that the liquidated-damages clauses were a penalty." The Panel determined that Belfiore had shown that the 20 percent initial payment satisfied Texas law for enforcing a liquidated-damages provision because Belfiore had proven that "(1) actual damages were difficult to prove and (2) stipulated damages were, in fact, a reasonable estimate of the actual damages." Finding the liquidated-damages clause enforceable, the Arbitration Panel awarded Belfiore the liquidated-damages amount; that is, Belfiore was awarded the 20 percent initial payment amounts of $496,000 and $540,000 against Sampieri.

Dissatisfied with the award, Sampieri filed a motion to vacate the Award in the trial court, arguing that the Award must be vacated because the Arbitration Panel had exceeded its authority under the purchase agreements when it enforced the liquidated-damages clause.[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(3)(A) (West 2011) (providing that a trial court shall vacate an award if arbitrators exceed their power). In support of this assertion, Sampieri pointed to the arbitration clause, which stated that the arbitrators' decision must be "based on and

---

[2]  Sampieri did not dispute that she had breached the purchase contracts when she failed to close.

7

consistent with Texas law." Sampieri averred that "[t]his provision is a limitation on the arbitrators' powers to make an award"; that is, she claimed that the arbitrators had the power to make an award consistent with Texas law, but they did not have the power to make an award inconsistent with Texas law. She asserted that the arbitrators had exceeded their authority because their enforcement of the liquidated-damages clause was not consistent with Texas law; thus, she claimed, the Award must be vacated as required by the Texas Arbitration Act ("TAA"). *See id.*

Sampieri also claimed that, by agreeing that the arbitrators' award must be consistent with Texas law, the parties contractually agreed to expand judicial review of the Award to include a review for errors of law. In other words, Sampieri claimed that the limiting language in the arbitration clause—providing that the arbitrators' decision must be consistent with Texas law—served to limit the Arbitration Panel's power to that of a judge, whose decisions are reviewable on appeal.

Responding to Sampieri's claims, Belfiore asserted that the Arbitration Panel did not exceed its powers by issuing an award inconsistent with Texas law. Belfiore averred that the arbitration clause does not "contain clear language expressly limiting the authority of the Panel or expanding [the trial court's] powers of review." Belfiore also claimed that, even if judicial review of the Award were permitted, the Panel's decision to enforce the liquidated-damages provision was consistent with Texas law; that is, the Panel's decision was not an error of law.

8

The trial court conducted a hearing on the parties' motions. Following the hearing, the trial court signed an order vacating the arbitration award. The trial court supported its ruling as follows: "[H]aving considered the award, the record below, the exhibits, the Motion to Vacate, and the Motion of Belfiore to Confirm the Award, and having heard the arguments of counsel, [the trial court] finds that the arbitrators exceeded their powers and that their award must he vacated."

Belfiore now appeals the trial court's vacatur of the Arbitration Award. Presenting three issues, Belfiore contends (1) the parties did not agree to limit the Panel's authority to that of a judge and to expand judicial review of the Award; (2) the Award is based on, and consistent with, Texas law; and (3) the trial court's vacatur of the Award violates TAA section 171.088.

### Standard of Review

We review a trial court's decision to confirm or to vacate an arbitration award de novo. *Port Arthur Steam Energy LP v. Oxbow Calcining LLC*, 416 S.W.3d 708, 713 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). In conducting this review, we examine the entire record. *Ouzenne v. Haynes*, No. 01–10–00112–CV, 2012 WL 1249420, at *1 (Tex. App.—Houston [1st Dist.] Apr. 12, 2012, pet. denied) (mem. op.). Here, we have the complete record from the arbitration hearing.

## Basis for Vacatur of the Arbitration Award

Pursuant to the TAA, on application by a party, the trial court "shall" confirm an arbitration award "[u]nless grounds are offered for vacating, modifying, or correcting an award under Section 171.088 or 171.091." TEX. CIV. PRAC. & REM. CODE ANN. § 171.087 (West 2011). Relevant to this appeal, TAA Section 171.088 provides that a trial court shall vacate an arbitration award on a showing that the arbitrators exceeded their powers. *Id.* § 171.088(a)(3)(A).

"In arbitration conducted by agreement of the parties, the rule is well established that an arbitrator derives his power from the parties' agreement to submit to arbitration." *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 90 (Tex. 2011) (quotation omitted). It follows, then, that the limits of an arbitrator's power is determined by agreement of the parties. *See id.* at 95.

In *Nafta Traders*, the supreme court held that the TAA does not prohibit parties from agreeing that an arbitrator has no more power than a judge—that is, parties may agree that the arbitrator does not have the authority to reach a decision based on reversible error. *See id.* at 95–97. By so agreeing, parties concomitantly agree to expanded judicial review of the arbitration award for reversible error. *See id.* at 97. In such cases, the arbitrator's decision is subject to the same review as a judicial decision. *See id.* at 102.

Here, Sampieri asserted that, by agreeing that the arbitrators' decision must be consistent with Texas law, the parties agreed that the arbitrators' decision-making power was limited to that of a judge, reviewable for reversible error by the trial court. Sampieri claimed that the Arbitration Panel's decision to enforce the liquidated-damages provision was a reversible error of law and thus exceeded the power given to the Panel, requiring the Award to be vacated. The trial court vacated the Award, agreeing that the Panel had exceeded its authority.

On appeal, Belfiore first contends that the parties did not clearly agree to limit the Panel's decision-making authority to that of a judge, whose decision is reviewable for errors of law. Belfiore then asserts that, even under expanded judicial review, the record from the arbitration hearing shows that the Panel correctly determined that the liquidated-damages provisions were enforceable.

Because it is dispositive, we address Belfiore's second issue. We assume, without deciding, that the parties agreed that the "consistent with Texas law" language in the purchase contracts limited the Panel's power to that of a judge, and we review the Award under expanded judicial review to determine whether the Panel committed an error of law when it enforced the liquidated-damages provisions.

## Liquidated Damages

### A.  Legal Principles

Liquidated damages is a measure of damages that parties agree in advance will be assessed in the event of a contract breach.  *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 431 (Tex. 2005).  A liquidated-damages provision is unenforceable if it is actually a penalty for noncompliance rather than "just compensation" for loss.  *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991).  "While the question may require a court to resolve certain factual issues first, ultimately the enforceability of a liquidated-damages provision presents a question of law for the court to decide."  *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 70 (Tex. 2014).

We enforce a liquidated-damages clause if (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages is a reasonable forecast of just compensation.  *Phillips*, 820 S.W.2d at 788.  Both findings are "indispensable," thus if either element is lacking, the provision is unenforceable.  *FPL Energy*, 426 S.W.3d at 69.  "We evaluate both prongs of this test from the perspective of the parties at the time of contracting."  *Id.* at 69–70.

The party asserting the affirmative defense of penalty bears the burden to demonstrate that the contractual provision is an unenforceable penalty rather than an enforceable liquidated-damages provision.  *SP Terrace, L.P. v. Meritage Homes of*

*Tex., LLC*, 334 SW3d 275, 287 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "Generally, that party must prove the amount of actual damages, if any, to demonstrate that 'the actual loss was not an approximation of the stipulated sum.'" *Id.* (quoting *Baker v. Int'l Record Syndicate, Inc.*, 812 S.W.2d 53, 55 (Tex. App.—Dallas 1991, no writ)). However, a liquidated-damages provision may be unreasonable "because the actual damages incurred were much less than the amount contracted for." *Phillips*, 820 S.W.2d at 788.

## B.    Analysis

We first consider the difficulty of estimating, at the time of contracting in October 2014, the damages that Belfiore would incur when Sampieri breached the contracts and failed to close on the two condominiums in March 2016. In making this analysis, we are mindful of the following:

> Texas courts have recognized that often "[i]t is impossible to forecast the damages which might flow to the seller of real property in the event of breach of the contract by the purchasers," because "[r]eal property has a fluctuating value' and "[t]here is no way to ascertain at any given time what the value of a particular tract of real property might be in the future."

*Chan v. Montebello Dev. Co.*, No. 14–06–00936–CV, 2008 WL 2986379, at *3 (Tex. App.—Houston [14th Dist.] July 31, 2008, pet. denied) (mem. op.) (quoting *Naylor v. Siegler*, 613 S.W.2d 546, 547 (Tex. Civ. App.—Fort Worth 1981, no writ)).

13

Sampieri signed the purchase contracts for the two condominium units in October 2014 while the high-rise building was still under construction. The building would not be substantially completed until February 2016, and Sampieri would not be scheduled to close until March 2016.

Sampieri points out that the evidence showed, when she signed the purchase contracts, demand for the condominiums "was so great that the prices had been raised twice, and only 5 units out of 46 remained unsold," and "[a]ll of the units sold for the asking price with no discounts." Sampieri asserts, "At the time [she] signed the Purchase Agreements there was no reason to believe that Belfiore would sustain any significant loss if she failed to close on the contract." However, Belfiore's corporate representative, Giorgio Borlenghi, provided testimony indicating that the amount of damages resulting from a failure to close is difficult to determine because of the fluctuations in the Houston real estate market.[3]

Borlenghi stated that, since 1980, he has developed four high-rise condominiums in Houston with a total of approximately 660 units. Borlenghi testified that there is a correlation between the strength of the oil and gas industry and the success of the Houston luxury condominium market. He stated, "[W]hen it comes to high-end real estate, we're all dependent on the economic conditions of

---

[3]     Borlenghi's testimony at the arbitration hearing was both live and by deposition.

Houston. . . . I am not in the oil business, but I depend on the oil business, because, otherwise, I don't sell units."

Borlenghi testified that, between October 2014, when the parties signed the purchase contracts, and March 2016, when Sampieri breached the contracts, the price of oil dropped, negatively affecting the Houston real estate market. With respect to reselling the condominium units post-breach, Borlenghi testified, "We made a decision [about lowering the listing price for Unit 702] considering the market, the demand that was not there, the fact that economic—that economic situation has changed in Houston, and the fact that if we want to sell them, we must sell [the units] as quickly as possible . . . [b]ecause they cost too much to keep." This evidence of the uncertainty of the real estate market suffices to meet the "difficulty of estimation" prong of the liquidated-damages test.[4] *See FPL Energy*, 426 S.W.3d at 70; *see also Chan*, 2008 WL 2986379, at *3 ("Texas courts have consistently held that damages for breach of a contract to buy or sell real estate are 'uncertain and not easily estimated with accuracy.'") (citing *Thanksgiving Tower Partners v. Anros Thanksgiving Partners*, 64 F.3d 227, 232 (5th Cir. 1995)).

---

[4] Sampieri also suggests that the liquidated damages were not a reasonable forecast of damages because the real estate market for luxury condominiums was strong when the contracts were signed; however, the building was nearly 1.5 years from completion at that time of the parties' closing. Given the fluctuation and uncertainty of the real estate market, a strong real estate market at the time the purchase contracts were signed would not preclude the liquidated damages from being a reasonable forecast of damages should Sampieri fail to close.

We next turn to the second prong, the reasonableness of the forecast of damages. The liquidated damages were agreed by the parties to be 20 percent of the purchase price of each condominium unit, equaling $496,000 for Unit 702 and $540,000 for Unit 1102.

Sampieri asserts, as she did at arbitration and in the trial court, that the liquidated damages were not a reasonable forecast of just compensation. Pointing to Borlenghi's testimony, Sampieri avers "the amount of the initial payment required under the Purchase Agreement was not based on any analysis of the amount of damages it might sustain in the event of a breach by the purchaser, but was a standard percentage used in all of Mr. Borlenghi's developments." Sampieri criticizes, "Belfiore had done no calculation or estimation of any losses likely to result from a breach, but had simply used the same form contract prepared by its attorneys without reviewing it to see if it fit this specific development." This testimony, however, must be read in context of Borlenghi's testimony as a whole.

When asked, whether the purchase contracts were "the same form that you had used in other condominium developments or was it drawn up [by Belfiore's attorneys] specifically for Belfiore," Borlenghi responded, "It was drawn up specifically for this project, in my personal opinion, following a format that we had used before."

Borlenghi acknowledged that, aside from outside counsel, no one at Belfiore had reviewed the purchase agreements. However, Borlenghi disagreed that no thought had gone into choosing 20 percent as the amount of liquidated damages. He stated that the amount was based on past experience with similar projects. When asked whether he had done "a written analysis of the amount of damages that might reasonably be expected," Borlenghi responded, "I don't need to do any written analysis, because I know the substantial additional costs and losses that we would suffer if a buyer does not go forward with their purchase." Borlenghi then detailed the "substantial additional costs" that Belfiore incurs when a purchaser fails to close and the company must hold the property and renew its efforts to find a buyer.

Borlenghi testified that, per unit, these costs include $4,500 monthly maintenance fees, insurance premiums, $5,000 in monthly taxes, and the cost of marketing the units for resale. But Borlenghi emphasized that "the primary loss is due to the fact that these are very special particular buildings." Borlenghi elaborated as follows:

> We are not selling condominiums; we are selling luxury, large, expensive, high-rise condominiums. By the finish, the buyer who is interested in these units is a very particular buyer who wants to highly customize their home. Because of that —and that is the reason that they like to buy even before we start construction or, at the latest, during construction, because they have the time to design the units with the decorator/designers. So as soon as the building is finished, they have made all their selections and they can finish the unit and move in. Once the building is finished, that doesn't exist anymore, and we lose a great advantage that we can give to our buyers. That forces us, because we

are not in the business of keeping units for investment, to have to discount the units once the building is finished.

In fact. . . Unit 1102 was placed under contract to this particular buyer. . . for two million seven, plus they asked us for that unit to finish it out for them under a separate contract. So we spent 309,000 of our own money to finish that unit, and now they don't want to buy.

So now we have to put it under—under sales. We have listed—now that finally this particular buyer has released them to us and we can market them—we have listed now that unit for 2.8 million, a loss right there of 209,000 [sic], okay?

[Unit] 702 was listed at two million five eighty. We sold it to them. We put it under contract for two million four eighty because they were buying two units and they requested a $100,000 discount that was granted to them. We now have—we now have that unit listed for 2,300,000, a loss—a loss of 280,000, and we don't know when we're going to sell it. Is it going to be six months, one year, ten years? We don't know. We lost the opportunity to sell that unit at the right—right time.

Unit 1102, also because of the particular nature of this project and this unit, has an additional problem. We spent [$]309,000 to finish the unit the way this buyer wanted. It might not be [what] other buyers want[].

. . . .

I can give you other examples. There were four other units that—where the purchasers decided not to go forward. They released the unit, they released the earnest money, and they went their way. We have sold two of those four units at substantial discounts from what we had under contract, because this is a particular project where people want to customize.

So every time a buyer does not go forward, we have huge, huge losses, and we don't know for how long. We don't need to make lists to know what those losses are. That's what they are.

18

At the time of the arbitration hearing, Unit 702 was still on the market. Belfiore had reduced the price $280,000 from the original listing price. Belfiore also presented evidence showing that, as of December 31, 2016, its total losses for Unit 702, including maintenance costs, taxes, insurance, utilities, and price reduction, was $355,621.84. That is 72% of the initial payment of $496,000 for Unit 702 designated as liquidated damages. When questioned by one of the arbitrators about his losses on that unit, Belfiore testified, "I cannot tell you today what my [final] losses will be on 702, because I might not sell it for 14 years. And that's where really I need to count on certain number to give me that comfort when we sign a contract. That certain number is 20 percent."

Unit 1102 was resold nine months after Sampieri breached the purchase contract. The condominium was resold for the same price that Sampieri had contracted to pay. Sampieri asserts that this proves that the liquidated damages for Unit 1102 are disproportionate to the actual damages that Belfiore sustained. However, Belfiore offered evidence showing that it had incurred expenses after the breach for Unit 1102, totaling $423,812.59. This equals 78% of the initial payment of $540,000 designated as liquidated damages. The post-breach expenses for Unit 1102 included $348,000 in remodeling costs, as well as maintenance costs, taxes, insurance, and utilities. Borlenghi also testified that Belfiore incurred marketing costs and legal fees in addition to the $348,000 in costs.

19

Belfiore also offered evidence showing that purchase contracts on four other units had also been breached by other purchasers, forcing Belfiore to put the units back on the market. These purchase contracts also had the 20 percent liquidated-damages provision. The evidence showed that, as of two months before the arbitration hearing, Belfiore's post-breach losses on the other four units ranged from 13 percent to 135 percent of the initial payments made by the original purchasers.

Finally, Sampieri asserts that the liquidated damages were not a reasonable forecast of damages because Borlenghi acknowledged that Belfiore's lender required a liquidated-damages clause in the purchase agreements based on 20 percent of the purchase price. However, Borlenghi did not testify that this was the only basis for the 20 percent liquidated damages; to the contrary, as discussed, Borlenghi testified that, based on his decades of experience in Houston's luxury condominium market, the liquidated damages, at a rate of 20 percent, were necessary to protect Belfiore from its losses in the event of a breach by a purchaser.

In sum, the evidence demonstrated that the liquidated damages were a reasonable forecast of the damages Belfiore would sustain in the event Sampieri breached the purchase contracts by failing to close. The evidence also showed that, with respect to Unit 1102, the liquidated damages were not disproportionate to the monetary loss that Belfiore actually sustained as a result of the breach. Sampieri did

not meet her burden to prove her affirmative defense that the liquidated-damages provisions were a penalty.

We conclude that, based on the record, the Arbitration Panel did not reversibly err when it enforced the liquidated-damages provisions in the purchase contracts; that is, its decision was consistent with Texas law. We hold that the Panel did not exceed its authority in rendering the Arbitration Award. Accordingly, we hold that the trial court erred when it vacated the Arbitration Award and failed to grant Belfiore's application to confirm the Award. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.087 (providing that trial court shall confirm arbitration award unless grounds are offered for vacating, modifying, or correcting an award).

We sustain Belfiore's issue two, which is dispositive of this appeal. *See* TEX. R. APP. P. 47.1.

## Conclusion

We reverse the trial court's order vacating the Arbitration Award and render judgment confirming the Award.


Laura Carter Higley
Justice

Panel consists of Justices Jennings, Keyes, and Higley.

21