Opinion issued October 22, 2013.



**In The**

# Court of Appeals

**For The**

# First District of Texas

---

### NO. 01-12-01165-CV

---

**PORT ARTHUR STEAM ENERGY LP, Appellant**

**V.**

**OXBOW CALCINING LLC, Appellee**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Cause No. 1174311**

---

## O P I N I O N

This appeal involves the parameters for setting aside an arbitral decision based on the evident partiality of an arbitrator. The underlying arbitration, between two corporations, involved the allocation of responsibility for

environmental compliance costs at an industrial facility.  Oxbow Calcining LLC initiated the arbitration proceeding against Port Arthur Steam Energy, L.P. (PASE), before the American Arbitration Association (AAA).  Oxbow and PASE selected David Peden as one of the arbitrators to serve on a three-member panel.

Before the AAA panel, the parties completed discovery and participated in a multi-day evidentiary hearing.  After the hearing, but before the arbitrators had issued their decision, the Yetter Coleman law firm, representing Oxbow, learned of its appellate victory on behalf of another of its clients, Anglo-Dutch Petroleum Int'l Inc., in the Supreme Court of Texas.  *See Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.* 352 S.W.3d 445 (Tex. 2011).  The Yetter Coleman attorneys in the arbitration proceeding were unaware that other Yetter Coleman lawyers had represented Anglo-Dutch in that appeal, in which a former employee of Greenberg Peden sought a recovery for attorney's fees against Anglo-Dutch.

Upon learning of its counsel's involvement in the *Anglo-Dutch* appeal, Oxbow objected to Peden's further participation in the arbitration.  Oxbow also moved to disqualify Peden as an arbitrator, citing Yetter Coleman's representation of Anglo-Dutch in the fee suit, and Peden's lack of disclosure of the existence of the suit at the time he was selected as an arbitrator.  Following its process for resolving motions to disqualify, the AAA denied Oxbow's motion.

2

The arbitration panel thereafter issued a unanimous decision, largely favoring PASE. When PASE moved to confirm the award in state district court, Oxbow moved to vacate it, citing the evident partiality of an arbitrator as the ground. *See* 9 U.S.C. § 10(a)(2); TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(2)(A) (West 2011).[1]

The trial court denied confirmation and granted Oxbow's motion to vacate the arbitrator's decision, concluding that the standard for evident partiality had been met. On appeal, we determine whether Peden's failure to discover Yetter Coleman's representation of both Oxbow and Anglo-Dutch—and thus Peden's failure to disclose to Oxbow that the Yetter Coleman firm also had represented Anglo-Dutch—demonstrates evident partiality so as to require vacatur of the arbitrator's decision. We conclude that it does not and therefore reverse.

**Background**

The AAA proposed David Peden as a panel member to hear the dispute and sent Peden's resume to the parties. Peden listed his work history:

- Partner, Porter & Hedges, L.L.P. 2001- present.
- Shareholder, Director, and Vice-President, Greenberg Peden P.C., 1974-2001.

---

[1] The parties did not specify whether their arbitration agreement fell under the federal or state arbitration act, so they proceeded under both.

3

Along with the notice of Peden's appointment, the AAA forwarded Peden's supplemental disclosures to the parties. These disclosures included the results of a conflicts check from Peden's current firm, Porter & Hedges. Peden also wrote: "I have no way of searching the records from my old firm prior to the time I joined Porter & Hedges." Peden also disclosed that, while he did not recall dealings with any of the lawyers involved in the proceeding, "[i]t is likely that my firm has had or will have dealings with the firms listed as counsel." He invited the lawyers to the proceeding to "remind me if I have failed to remember correctly" any past dealings with counsel.

By 2010, Peden had been a partner at Porter & Hedges for more than nine years. The Greenberg Peden law firm closed its practice in 2001. Peden was an officer and director of Greenberg Peden, and having been last elected as a director of the firm in 2001. The firm's Secretary of State filings continued to list Peden as a director. Although it was no longer a law practice, Greenberg Peden continued to hold a bank account for the purpose of collecting receivables for legal fees that had accrued before it closed. As an officer of the firm, Peden retained a right to receive his proportional share of any funds the firm received.

**The *Anglo-Dutch* litigation**

While Greenberg Peden was an active law firm, it employed Gerald Swonke as counsel. The firm's agreement with Swonke provided that he would receive ninety percent of the fees from any business he generated, and Greenberg Peden would retain ten percent of those fees.

In October 2000, Anglo-Dutch hired Swonke, together with the firm of McConn & Williams, to pursue a lawsuit over the development of oil and gas prospects in Kazakhstan. Anglo-Dutch agreed to pay Swonke an hourly fee in a letter agreement, prepared on Greenberg Peden letterhead. In a separate agreement, Anglo-Dutch executed a contingency fee contract with McConn & Williams.

While at Greenberg Peden, Swonke performed 277 hours of work for Anglo-Dutch, generating about $300,000 in attorney's fees at his hourly rate. After Greenberg Peden closed in 2001, Swonke moved his law practice to McConn & Williams, where he continued to work on the *Anglo-Dutch* matter. At the conclusion of the *Anglo-Dutch* case, a fee dispute arose between Swonke and Anglo-Dutch. Swonke sought to recover payment for all of his time at an hourly rate, including his time at McConn & Williams, under the hourly contract he and Anglo-Dutch had executed while Swonke worked at Greenberg Peden. Swonke

contended that this hourly fee agreement was a contract for personal services that followed him when he moved his practice. Anglo-Dutch disagreed; it contended that its hourly fee agreement was with Greenberg Peden, not Swonke individually, and thus it was obligated only to pay hourly rates for Swonke's time while at Greenberg Peden.

Unable to resolve the dispute, in April 2004, Anglo-Dutch sued Swonke and Greenberg Peden. Anglo-Dutch sought a declaration that it owed Greenberg Peden approximately $300,000 for the work that Swonke performed while at Greenberg Peden, and that it owed Swonke nothing for the work he performed while at McConn & Williams. No party sought a recovery against Greenberg Peden in the case.

Peden was called as a witness during the September 2007 jury trial. He testified that Greenberg Peden had no economic interest in any fees owed after Swonke left the firm. Anglo-Dutch agreed with this view of the case, and its chief executive testified that Anglo-Dutch had been willing all along to pay the fees that it incurred for services from Greenberg Peden.

Greenberg Peden executed an "Assignment and Release" during the course of the Anglo-Dutch litigation. Peden testified that the release was to "make it real clear to . . . Anglo-Dutch that [Greenberg Peden] had no claims and we're not

6

asserting any claims." The 2004 Assignment and Release released any claims Greenberg Peden may have had against Anglo-Dutch, and it made Swonke—not Anglo-Dutch—responsible for remitting the firm's portion of any fees collected.

The *Anglo-Dutch* trial culminated in a jury verdict in favor of Swonke. While the case was on appeal, Anglo-Dutch retained the Yetter Coleman firm to represent it for the appeal against Swonke. The intermediate appellate court affirmed the trial court's judgment, and Yetter Coleman sought review in the Texas Supreme Court.

In the fall of 2010, just before the parties received Peden's arbitration disclosures, Gregory Coleman, the appellate practice head at Yetter Coleman, presented oral argument to the Texas Supreme Court in the *Anglo-Dutch* fee suit. In late August 2011, the Texas Supreme Court reversed the court of appeals' judgment in the fee suit, holding that Anglo-Dutch had not contracted with Swonke individually, and thus the hours that Swonke expended after leaving the Greenberg Peden firm were not included in the hourly agreement.

The Texas Supreme Court's *Anglo-Dutch* decision came after Oxbow and PASE had spent a year in the arbitration proceeding. The parties had completed discovery and tried the dispute in an eight-day evidentiary hearing; a decision of the arbitration panel was pending. On receiving news of Yetter Coleman's victory

in *Anglo-Dutch*, the Yetter Coleman attorneys representing Oxbow reviewed the appellate record in the fee suit.

After that review, Oxbow objected before the AAA to Peden's continued participation in the arbitration, based on evident partiality, and Oxbow moved to disqualify him. Oxbow cited Peden's failure to disclose his connection to the *Anglo-Dutch* litigation and that his connection with Greenberg Peden was ongoing, rather than concluded.

Peden responded that: (1) he had no involvement in the fee suit other than as a trial witness; (2) he was not a party to the fee suit; (3) he had no personal exposure for any potential liability in it; (4) he was not involved in the appeal; and (5) he had not known that Yetter Coleman was involved in the appeal. Peden further responded that he learned of Yetter Coleman's appellate involvement in the *Anglo-Dutch* litigation when Oxbow filed its motion with the AAA seeking to disqualify him. Although Peden had reviewed the Texas Supreme Court's slip opinion, it did not identify the parties' attorneys.

The AAA denied Oxbow's motion to disqualify Peden, and it reaffirmed the appointment of all three arbitrators. *See* AAA Com. Arbitration R. & Mediation Proc. §17(b) (June 1, 2009) ("Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the

8

arbitrator should be disqualified [based on partiality or lack of independence], and shall inform the parties of its decision, which decision shall be conclusive.").

Following the AAA's ruling on Oxbow's motion to disqualify, the arbitration panel issued its unanimous decision, rejecting Oxbow's principal claim regarding PASE's liability for the cost of Oxbow's environmental compliance, finding in favor of Oxbow on another claim, and awarding damages to both parties.

**Trial court proceedings**

PASE moved to confirm the arbitrators' decision in the trial court. Oxbow counter-petitioned to vacate the award, re-urging the grounds it raised before the AAA. The trial court found that:

- Peden continued to be a shareholder and officer of Greenberg Peden through the date of the arbitration proceedings, and ongoing litigation existed involving that firm and its efforts to collect fees owed to it;

- Peden could and should have called former Greenberg Peden colleagues to ask about pending matters to perform a rudimentary conflicts check;

- Peden stood to "gain or lose thousands of dollars" based upon the outcome of the *Anglo-Dutch* litigation.

- The disclosures that Peden proffered to the parties were misleading because they did not account for Greenberg Peden's ongoing collection efforts after the law firm closed its practice in 2001.

The trial court denied confirmation, and it vacated the arbitration decision.

9

## Discussion

## I.    Standard of review

An appellate court reviews de novo a trial court's decision as to vacatur or confirmation of an arbitration award. *In re Chestnut Energy Partners, Inc.*, 300 S.W.3d 386, 397 (Tex. App.—Dallas 2009, pet. denied); *Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564, 567–68 (Tex. App.—Dallas 2008, no pet.). Because Texas law favors arbitration, judicial review of an arbitration decision is "extraordinarily narrow." *Hisaw & Assocs. Gen. Contractors, Inc. v. Cornerstone Concrete Sys., Inc.*, 115 S.W.3d 16, 18 (Tex. App.—Fort Worth 2003, pet. denied); *see IPCO-G. & C. Joint Venture v. A.B. Chance Co.*, 65 S.W.3d 252, 256 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). An arbitration decision has the same effect as a judgment of a court of last resort; accordingly, all reasonable presumptions are indulged in its favor. *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002) (quoting *City of San Antonio v. McKenzie Constr. Co.*, 150 S.W.2d 989, 996 (Tex. 1941)).

To the extent disputes about material facts exist in the context of a claim of evident partiality, we review the trial court's resolution of them for legal and factual sufficiency. *Amoco DT Co. v. Occidental Petroleum*, 343 S.W.3d 837, 844 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (quoting *Las Palmas Med.*

10

*Ctr. v. Moore*, 349 S.W.3d 57, 66 (Tex. App.—El Paso 2010, pet. denied)). An evident partiality inquiry is a fact-intensive one, but the judiciary's involvement in assessing these facts is limited. *Mariner Fin. Group v. Bossley*, 79 S.W.3d 30, 34 (Tex. 2002) (quoting *Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 435 (11th Cir. 1995)). "The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality." *Commw. Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 151, 89 S. Ct. 337, 340 (1968), *quoted in Burlington N. R.R. Co. v. TUCO Inc.*, 960 S.W.3d 629, 635–36 (Tex. 1997).

Under both the Federal Arbitration Act and the Texas General Arbitration Act, the party seeking to vacate an arbitration decision based on evident partiality bears the burden of proof. *Amoco*, 343 S.W.3d at 841; *see Prudential Sec. Inc. v. Shoemaker*, 981 S.W.2d 791, 793 (Tex. App.—Houston [1st Dist.] 1998, no pet.); *see also* 9 U.S.C. § 10; Tex. Civ. Prac. & Rem. Code Ann. § 171.087 (West 2011).

## II. Analysis

An arbitrator's failure to disclose known facts that "might, to an objective observer, create a reasonable impression of the arbitrator's partiality" can support vacatur of an arbitration decision. *Mariner Fin. Group*, 79 S.W.3d at 32 (quoting *TUCO*, 960 S.W.2d at 630). In *Mariner,* the summary judgment record on appeal

11

was "silent about whether [the arbitrator] remembered . . . or ever knew of" a witness in the arbitration who had testified against the arbitrator in a legal malpractice case against the arbitrator two and a half years earlier. *Id.* at 33. The court held that "the state of [the arbitrator's] knowledge about [the witness] is a fact issue material to determining his partiality." *Id.* In this case, after conducting an evidentiary hearing, the trial court did not find that Peden knew of Yetter Coleman's connection to the *Anglo-Dutch* suit. It nonetheless vacated the decision, because it concluded that Peden had failed to exercise reasonable diligence to discover the connection.

### *Diligence*

Thus, the question whether Peden's failure to disclose the relationship between Peden's law firm and Yetter Coleman constitutes evident partiality begins with an assessment of the level of diligence required to discover that relationship. It is undisputed that Yetter Coleman's appellate representation of Anglo-Dutch began three years after Greenberg Peden had assigned its interest in the suit to Swonke and had waived all claims against Anglo-Dutch, and two years after Peden gave his trial testimony, which was the extent of his involvement in the suit. Greenberg Peden, which did not provide legal services after 2001, no longer maintained a conflicts check system. Even if it had, a check of its records would

12

not have yielded information about Yetter Coleman's connection to Anglo-Dutch, because that connection did not exist until six years after Greenberg Peden had closed its law practice. The record evidence does not support a finding that Peden knew or had been notified of Anglo-Dutch's decision to retain the Yetter Coleman firm for its appeal. The trial court made no such finding; instead, it found that Peden "easily could have called former Greenberg Peden colleagues to ask about pending matters to perform at least a rudimentary form of conflicts check."

Peden's disclosures placed Yetter Coleman on notice of their limitations, including that Peden had not performed a conflicts check with respect to Greenberg Peden. *See Mariner Fin. Group*, 79 S.W.3d at 37 (Owen, J., concurring) ("A "reasonable effort to inform" oneself would not require review of every matter in which a lawyer or witness may have been adverse to or critical of the potential arbitrator."). Because the trial court did not find that Peden knew of the relationship between Greenberg Peden and Oxbow's counsel's representation of another client, and Peden's disclosures warned of their inadequacy with respect to Greenberg Peden, we hold that Peden's failure to discover the relationship will not support a finding of evident partiality. *See Mariner Fin. Group*, 79 S.W.3d at 33 ("[T]he state of [the arbitrator's] knowledge about [the relationship] is a fact issue material to determining his partiality."); ABA Code of Ethics for Arbitrators

13

in Com. Disputes, Canon II(A) (requiring prospective arbitrator to disclose "any *known* direct or indirect personal interest in the outcome of the arbitration" and "any *known* existing or past financial, business, professional or personal relationships which might reasonably affect impartiality or the lack of independence in the eyes of any of the parties.") (emphasis added).

### *Representation of other clients in other matters*

Oxbow further contends that, whether or not Peden had knowledge of Yetter Coleman's involvement in the *Anglo-Dutch* litigation, Oxbow nonetheless has demonstrated Peden's evident partiality. Oxbow points to two findings the trial court made: (1) the *Anglo-Dutch* case was ongoing at the time of the arbitration; and (2) Peden individually stood to financially gain or lose based upon its final outcome.

Oxbow ignores, however, that neither Peden nor Greenberg Peden was a party to the *Anglo-Dutch* appeal. The amount owed to Greenberg Peden was undisputed in the *Anglo-Dutch* litigation, neither Yetter Coleman nor its client sought relief against Greenberg Peden in the appeal, and Greenberg Peden had released Anglo-Dutch from any liability to it. Greenberg Peden was not served with the appellate briefing that Yetter Coleman filed on behalf of Anglo-Dutch. There was simply no case or controversy between Anglo-Dutch and Greenberg

14

Peden. Even before the time of Yetter Coleman's involvement, Anglo-Dutch has not sought relief against Greenberg Peden; Greenberg Peden has not sought relief against Anglo-Dutch.

To the extent that the trial court found that Peden could "gain or lose" in the *Anglo-Dutch* suit, this finding is irrelevant to a vacatur determination in this arbitration—whatever the gain or loss, it would not come from Oxbow, or its counsel, or even its counsel's other client, Anglo-Dutch, which had been released from liability. Yetter Coleman was not a party to the Anglo-Dutch suit and is not a party to this dispute. Oxbow's and Anglo-Dutch's mutual, but unrelated, decision to select the same counsel does not create a conflict with Peden, who has never been represented by that counsel or adverse to that counsel in any suit. Without evidence that Peden had actual knowledge of Yetter Coleman's role in the *Anglo-Dutch* litigation, the relationship between Peden and another client of the Yetter Coleman firm—a client who has no connection to this arbitration proceeding—does not independently support a finding of evident partiality. As the Fifth Circuit observed in recognizing the high threshold for vacatur: "No case we have discovered in research or briefs has come close to vacating an arbitration award for nondisclosure of such a slender connection between the arbitrator and a party's counsel." *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d

15

278, 284 (5th Cir. 2007) (reversing trial court vacatur; collecting cases). Particularly when the arbitrating authority has heard and rejected the challenge, the threshold should remain high. Absent a finding of actual knowledge of the relationship, we defer to the AAA's decision rejecting Oxbow's motion to disqualify Peden, which by the parties' express agreement, governs the resolution of their dispute, and under the AAA's rules "shall be conclusive." *See* AAA Com. Arbitration R. & Mediation Proc. § 17(b).

## Conclusion

We hold that the trial court erred in vacating the arbitration decision on the basis of evident partiality. We therefore reverse the judgment and remand the case to the trial court to enter judgment confirming it.

Jane Bland
Justice

Panel consists of Justices Keyes, Higley, and Bland.