In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00359-CV
NO. 09-18-00392-CV

_____

**OXBOW CALCINING LLC, Appellant**

**V.**

**PORT ARTHUR STEAM ENERGY, L.P., Appellee**

**On Appeal from the 172nd District Court**
**Jefferson County, Texas**
**Trial Cause No. E-201,894**

**MEMORANDUM OPINION**

In cause number 09-18-00359-CV, Oxbow Calcining LLC (Oxbow or Appellant) filed an interlocutory appeal of an order denying Oxbow's motion to compel arbitration (Order Denying Motion to Compel Arbitration) related to Plaintiff's Petition and Application for Post-Judgment Enforcement Orders filed by Port Arthur Steam Energy, L.P. (PASE or Appellee). *See* Tex. Civ. Prac. & Rem. Code Ann. 51.016 (West 2015). In that same cause number, Oxbow also moved for

1

this Court to review the trial court's Rule 24 Order requiring Oxbow to post a $2,353,284 bond and an additional $8,979,720 bond if any appeal remains pending on February 15, 2019 (Rule 24 Order). *See* Tex. R. App. P. 24. In cause number 09-18-00392-CV, Oxbow filed an appeal of a post-judgment order granting turnover relief and appointing a receiver to monitor Oxbow's Port Arthur petroleum coke calcining plant (Turnover Order).[1]

In cause number 09-18-00359-CV, we reverse the trial court's Order Denying Motion to Compel Arbitration and remand the case to the trial court for further proceedings consistent with this opinion. We also vacate the trial court's Rule 24 Order because considering our rulings, we conclude that no appellate security is

---

[1] A "turnover" order is a statutory procedural device through which judgment creditors may reach assets of a judgment debtor that are otherwise difficult to attach or levy by ordinary legal process. *See* Tex. Civ. Prac. & Rem. Code Ann. § 31.002 (West Supp. 2018); *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 224 (Tex. 1991). Under the statute, a judgment creditor can apply to a court for an injunction or other means to satisfy a judgment through a judgment debtor's property, including present or future property rights. *See* Tex. Civ. Prac. & Rem. Code Ann. § 31.002(a). To obtain turnover relief, a judgment creditor must prove "the judgment debtor owns property, including present or future rights to property, that is not exempt from attachment, execution, or seizure for the satisfaction of liabilities." *Id.* Upon finding the requirements of section 31.002(a) are satisfied, a trial court has discretion to issue a range of remedies, including ordering the judgment debtor to turn over nonexempt property that is in the debtor's possession, or is subject to the debtor's control, to a designated sheriff or constable for execution, and "appoint[ing] a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment." *See id.* § 31.002(b).

2

necessary. In cause number 09-18-00392-CV, we reverse the trial court's Turnover Order and vacate the order.

## Background Information

Oxbow owns and operates a petroleum coke calcining plant. Oxbow takes petroleum coke ("petcoke") from refineries and heats the petcoke in kilns to manufacture calcined coke. Adjacent to Oxbow's facility, PASE owns and operates a waste heat recovery facility that uses heat from three of Oxbow's four kilns to boil water to make steam that PASE sells primarily to another refinery to generate electricity. The waste heat from the three kilns can either be released (1) through three "hot stacks" directly connected to kilns or (2) through three "cold stacks" after the heat is routed through PASE's waste heat facility and cooled. PASE generates steam only when Oxbow releases waste heat through the cold stacks. According to PASE, "Oxbow has the ability to manipulate its dampers to curtail or completely shut off waste heat to PASE."

In February 2005, Oxbow's predecessor in interest, Great Lakes Carbon, LLC, and PASE entered into a Heat Energy Agreement (the HEA) to govern their relationship with respect to PASE's waste heat facility. Under the wording of the HEA, PASE paid Oxbow $1.00 for the facility in 2005, and PASE does not pay

3

Oxbow anything for the waste heat Oxbow delivers.[2] Instead, PASE pays Oxbow a portion of revenues from PASE's sale of steam from the waste heat facility. The HEA requires PASE to make a monthly "heat payment" to Oxbow equal to 30% of the steam revenue received by PASE for the preceding month, adjusted by a mechanism referred to by the parties as the "heat bank." The heat bank adjusts the amount of heat payments due to Oxbow based on Oxbow's calcined coke production from kilns 3, 4, and 5 and the price of natural gas. According to Oxbow, if it produces more than the "threshold amount" of 43,675 tons of calcined coke per month, then it accumulates a credit in the heat bank, but if it produces less than the threshold amount, it accumulates a deficit in the heat bank. The HEA provides the following regarding Oxbow's right to suspend performance under the HEA:

> Notwithstanding anything otherwise set forth in this Agreement, [Oxbow][3] shall have the right to suspend its performance hereunder, including by suspending production and delivery of flue gas to PASE, without liability to PASE at anytime that [Oxbow]: (a) receives a notice of alleged violation of Law or any similar notice from any Governmental Authority relating to, arising out of or in connection with the Steam Production Upgrade, the Steam Production Facility or the performance of this Agreement which, if further prosecuted or pursued,

---

[2] PASE argues that "PASE paid $1.00 in the HEA because it paid $38.5 million to refurbish and upgrade the steam plant assets . . . and committed to pay 30% of its steam revenues in Heat Payments to Oxbow for the full term of the HEA." PASE also contends that "PASE paid Oxbow approximately $34 million dollars for waste heat through 2011."

[3] When quoting the HEA, we substitute "Oxbow" for "G[reat] L[akes] C[arbon]", as Oxbow is Great Lakes Carbon's successor in interest.

may subject [Oxbow] to a material harm or detriment as reasonably determined by [Oxbow] and the suspension of its performance may be expected to mitigate the potential material harm or detriment as reasonably determined by [Oxbow], or (b) is named in, or otherwise made a party to, arising out of or in connection with the Steam Production Upgrade, the Steam Production Facility or the performance of this Agreement, the result of which might subject [Oxbow] to material harm or detriment as reasonably determined by [Oxbow]. . . .

By its written terms, the HEA requires both parties to operate and maintain their respective facilities in accordance with "Prudent Operating Practice" to comply with all applicable laws and permits and it requires Oxbow to use "Commercially Reasonable Efforts" to maximize the production and delivery of waste heat to PASE.

Section 14.1 of the HEA states that "[e]very dispute of any kind or nature between the Parties arising out of or in connection with this Agreement (each a "Dispute") shall be resolved in accordance with this Article 14, to the extent permitted by Law." Under Article 14 (the HEA's dispute resolution provisions), if a "Dispute" arises, either party may send a notice to the other party "requesting that the Dispute be referred to the senior management of the Parties." Section 14.3 provides for arbitration as follows:

(a) Any Dispute that has not been satisfactorily resolved within 30 days of the delivery of a notice in accordance with Section 14.2(a) shall be submitted by either Party to binding arbitration pursuant to the procedures set forth in this Article and pursuant to the Arbitration Rules. If, and to the extent that, the provisions of this Section 14.3 are inconsistent with the Arbitration Rules, the provisions of this Section

5

14.3 shall control in any arbitration proceeding to the extent permitted by Law.

(b) A copy of the submittal to arbitration pursuant to Section 14.3(a) shall be made in writing to the other Party, and shall set forth the nature of the Dispute, the amount involved, if any, and the remedies sought. The submittal to arbitration shall be made within a reasonable time after the expiration of the 30-day period set forth in Section 14.2(a).

(c) The arbitrator shall be appointed pursuant to the Arbitration Rules provided that any such arbitrator shall be experienced generally with the subject matter(s) of the Dispute and shall not have had an affiliation with either Party or any Party's Associated Parties within the seven-year period preceding the arbitration, or have any financial interest in the Dispute.

(d) The arbitration hearing shall be held in Houston, Texas, or such other place as may be mutually agreed upon by the Parties, and shall commence not later than 60 days after the date of the original demand under Section 14.3(a), except due to unavailability of the arbitrator. The arbitrator's award shall be made not later than 45 days after the date of closing of the hearing, or if oral hearings have been waived, after the date of transmitting the final statements and proof to the arbitrator; provided, however, that in no event shall any award be made later than 180 days after the date of the original demand for arbitration under Section 14.3(a).

(e) In arriving at his decision, the arbitrator shall consider the pertinent facts and circumstances and be guided by the terms and conditions of this Agreement, and, if a solution is not found in the terms of this Agreement, the arbitrator shall apply the governing law of this Agreement as set forth in Section 19.13; provided, however, that the arbitrator shall have no authority, power or right to alter, change, amend, modify, waive, add to or delete from any of the provisions of this Agreement, and any award rendered by the arbitrator shall be consistent with the terms and conditions of this Agreement. Both Parties shall have the right to present documentary evidence, witnesses and to cross examine witnesses. The decision of the arbitrator shall be

final and binding upon both Parties, and judgment on the arbitration award may be entered in any court having jurisdiction. Except as otherwise provided in Section 14.3(g), arbitration in accordance with this Section 14.3 shall be the exclusive means of resolving Disputes that are not resolved by negotiation or mediation, and neither Party shall seek recourse to a court or other authorities to resolve a Dispute or to appeal for revisions to an arbitration decision.

(f) Except as otherwise determined by the arbitrator in the exercise of his discretion, the fees and expenses of the arbitrator shall be shared equally by the Parties, and each Party shall bear its own costs and expenses.

(g) Notwithstanding the other provisions of this Section 14.3, each Party shall have the right at any time, at its option and where legally available, to commence an action or proceeding in a court of competent jurisdiction, in order to (i) compel the other Party to arbitrate a Dispute as contemplated by this Section 14.3, or (ii) seek and obtain a restraining order or injunction, but not monetary damages, to enforce the confidentiality provisions set forth in Article 17.

Furthermore, section 13.6 of the HEA provides the following regarding the limitation on Oxbow's liability as well as the source of monetary recovery from or against Oxbow:

Notwithstanding anything otherwise set forth in this Agreement, (a) [Oxbow]'s aggregate maximum liability for monetary damages with respect to any and all Claims in connection with the performance or non-performance of this Agreement or otherwise arising out of or in connection with this Agreement, shall be limited to the aggregate amount of future Heat Payments otherwise due to [Oxbow] during the remainder of the term at the time of any such Claim, and (b) PASE's exclusive means of monetary recovery from or against [Oxbow] with respect [to] any Claim whether pursuant to an arbitral award rendered in accordance with Article 14 or pursuant to any judgment, sanction, penalty, other award or otherwise, shall be to withhold amounts

7

otherwise due [Oxbow] hereunder in accordance with Article 6, with the understanding that [Oxbow] shall never be required to make any direct payment to PASE as a result of any Claim.

According to Oxbow, it received heat payments from 2005 until 2011, but Oxbow's production of calcined coke fell below the threshold amount in 2009 and its balance in the heat bank went negative in 2011 due to a decline in the market for calcined coke, and Oxbow has not received heat payments from PASE since 2011. Oxbow filed a Demand for Arbitration and a Statement of Claims in July 2010 asserting various claims against PASE, and PASE filed counterclaims against Oxbow. According to PASE, disputes about the interpretation and duties under the HEA were at issue before an arbitration panel in Houston:

> (1) the adequacy of the steam plant's pollution control equipment; (2) whether Oxbow was operating its calcining plant consistent with "prudent operating practice" as required by the Heat Agreement; (3) whether Oxbow was using "commercially reasonable" efforts to deliver flue gas energy to PASE's boilers; and (4) which party was responsible for the refurbishment and future maintenance of the cold stacks.

In December 2011, the arbitration panel concluded in its award that, among other things, the HEA does not impose on PASE any obligation to install pollution control equipment in Oxbow's portion of the Facility, Oxbow bears the risk of installing and maintaining pollution control equipment that will ensure Oxbow's operation complies with Oxbow's air permits and environmental laws, Oxbow is responsible for the maintenance of the cold stacks once properly installed, and PASE

8

is liable to Oxbow for $812,012 for PASE's share of the initial cost of the modification of the cold stacks to comply with HEA specifications. The arbitration award provided, however, that this amount would offset the amount awarded to PASE in the arbitration award. As for PASE's claims, the arbitration panel awarded PASE damages in the amount of $4,515,056 for lost revenue for Oxbow's breach of the sections of the HEA that required Oxbow to "use Commercially Reasonable Efforts to maximize the production and delivery of Flue Gas Energy" to PASE and to operate and maintain its facility "in accordance with Prudent Operating Practice to comply with all applicable Laws and Permits, and within the design parameters and limits of the applicable materials, equipment and construction." The Panel entered the following relief:

> [] PASE is awarded $4,515,056.00 as direct damages for the lost revenue caused by Oxbow's breaches of the Heat Agreement. This award of damages is to be offset by $812,012.00 for the costs of repairing the cold stacks, and $293,262.43 for unpaid City and County taxes for 2008-10, all in accordance with this Award. The net amount awarded to PASE against Oxbow is $3,409,781.57. PASE is entitled to pre-and post-award of interest as provided by governing law on this net amount. This is not a cash award requiring Oxbow to write PASE a check. It shall be handled in accordance with the specific provisions of the Heat Agreement regarding the heat bank as an offset.
>
> [] Oxbow did not prevail on its largest claim[] and is therefore not a prevailing party. While PASE did recover on its lost heat claim, it also lost out on several of its other claims for relief. So[,] neither party is clearly the prevailing party. The Panel declines to award either party the costs of arbitration or attorneys' fees incurred in this arbitration.

Each party is directed to bear its own costs and attorney's fees. The administrative fees totaling $41,600 and the compensation and expenses of the panel totaling $141,577.23 shall be borne as incurred.

[] This is a Final Award[] and is intended to be enforceable in any court of competent jurisdiction. All relief requested but not expressly granted herein is denied.

PASE moved to confirm the award in the 151st District Court of Harris County, and Oxbow moved to vacate the award on the ground of partiality of an arbitrator. *Port Arthur Steam Energy LP v. Oxbow Calcining LLC*, 416 S.W.3d 708, 710 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). The trial court denied confirmation and granted Oxbow's motion to vacate the arbitrator's decision. *Id.* On October 22, 2013, the First Court of Appeals reversed the trial court's order vacating the arbitration award and remanded to the trial court to enter judgment to confirm the arbitration award. *Id.* at 715. Oxbow filed a petition for review with the Texas Supreme Court which was denied. *Oxbow Calcining LLC v. Port Arthur Steam Energy LP*, No. 14-0103, 2014 Tex. LEXIS 1072 (Tex. Oct. 24, 2014). On January 8, 2015, the District Court for the 151st Judicial District of Harris County signed a judgment confirming the arbitration award, and the arbitration award was attached and incorporated within the judgment. The judgment included language that it is "enforceable in the same manner as any other judgment or decree of the Court[,]" and "resolve[d] all claims in this case and is intended to be a final judgment."

10

According to Oxbow, in 2010 the Environmental Protection Agency (EPA) substantially lowered maximum concentration levels for the National Ambient Air Quality Standards (NAAQS) for $SO_2$, and in late 2016, as part of an EPA-driven monitoring program, the Texas Commission on Environmental Quality (TCEQ) began to monitor Oxbow's and PASE's facilities to determine the impact of the operations on ambient air quality. According to Oxbow, Oxbow and PASE representatives met to discuss the changes in the regulations and Oxbow explained that the new regulations would limit Oxbow's ability to supply waste heat to the cold stacks that PASE uses to generate steam unless Oxbow spent large sums of money to install pollution control equipment for PASE's benefit. The record includes a 2017 email wherein Oxbow informed PASE that it was suspending use of the cold stacks for kilns 3 and 4 to mitigate the risk of $SO_2$ violations and stated that it did "not have enough data necessary to draw any conclusions regarding the continued delivery of [waste heat] from Kiln 5[]" but would inform PASE "[a]s soon as Oxbow is able to make a determination regarding Kiln 5[.]" The record reflects that in April and June 2017, the TCEQ notified Oxbow that the Port Arthur $SO_2$ monitoring station showed exceedences of the $SO_2$ NAAQS, and that the TCEQ agreed that all exceedences of the $SO_2$ NAAQS occurred while Oxbow's plant had at least one cold stack operating.

11

PASE contends that "Oxbow makes numerous 'factual' statements that are either inaccurate or misleading." PASE specifically disputes Oxbow's allegations that it has the right to shut down production and delivery of waste heat under the HEA. According to PASE, "[w]ith regard to a pollution issue, Oxbow has two choices: address the issue or shut everything down." PASE further contends that "Oxbow's pollution control duties are not subject to a Prudent Operating Practice limitation." Furthermore, PASE argues that "Oxbow offered no testimony to support a position that it was 'suspending' performance 'to mitigate the potential harm or detriment' supposedly resulting from its receipt of a 'Notice of Alleged Violation of Law' or any similar notice from any Government or Authority" and Oxbow failed to "offer any testimony of corrective action it was taking to mitigate or address any supposed potential material harm or detriment associated with its $SO_2$ emissions."

Before filing the Application for Turnover, PASE sent Oxbow a Notice of Failure to Perform Material Obligations under the Heat Energy Agreement in which PASE stated that "[p]ursuant to Section 14.2, PASE is hereby providing notice to Oxbow of the occurrence/existence of a Dispute that should be referred to senior management of Oxbow." According to Oxbow, it responded to the notice by designating its senior management representatives in accordance with the HEA

12

arbitration provision, the parties engaged in settlement negotiations including mediation, and the parties were unable to resolve the dispute.

According to a letter that is dated May 7, 2018, the County Judge for Jefferson County notified Oxbow by letter that TCEQ monitoring data showed excess $SO_2$ NAAQS and warned Oxbow that if not corrected, such exceedences could result in Jefferson County suing Oxbow for injunctive relief to preclude further violations.[4] In June 2018, Oxbow notified PASE that it was indefinitely suspending production of waste heat from kiln 5. Oxbow contends that since it stopped all waste heat to PASE, Oxbow has operated solely through the hot stacks with no additional exceedences of the $SO_2$ NAAQS.

On June 8, 2018, PASE filed Plaintiff's Petition and Application for Post-Judgment Enforcement Orders (the petition), and the suit was assigned to the 172nd Judicial District Court. PASE sought "post-judgment relief and orders from [the 172nd District Court] including, but not limited to, injunctive orders and/or, in the alternative, a Turnover Order, an Order Appointing a Receiver, and/or other orders or relief under §31.002 of the Texas Civil Practice & Remedies Code against Oxbow

---

[4] PASE argued in its Appellate Brief that the letter from the County Judge was admitted improperly at the hearing held in the trial court. PASE filed a post-submission motion alleging the letter was "orchestrate[d]" by Oxbow "to justify discharging all of its waste heat through Oxbow's hot stacks to avoid a TCEQ monitor and put PASE out of business[.]"

[], a Judgment Debtor of PASE[.]" According to its petition, PASE sought orders "to assist PASE in collecting a Judgment entered in favor of PASE against Oxbow in the amount of $3,409,781.57, plus pre-judgment and post-judgment interest" resulting from the December 2011 Arbitration Award and that "PASE has not been able to recover a single dollar from Oxbow to apply toward the satisfaction of this Judgment." Oxbow filed a Motion to Transfer Venue, and Subject Thereto, Its Motion to Compel Arbitration and Original Answer.

After a hearing, the 172nd District Court signed orders denying Oxbow's motions to transfer venue and compel arbitration and granting PASE's proposed Turnover Order. Oxbow filed a Notice of Appeal with this Court appealing the order denying Oxbow's Motion to Compel Arbitration and appealing the Turnover Order. Oxbow also filed an emergency motion to stay all trial court proceedings and discovery during the appeals. This Court issued an order granting a temporary stay and staying the enforcement of the Turnover Order and discovery in the case until further order of this Court. In the same order, we ordered the trial court to conduct a hearing pursuant to Rules 24 and 24.2 of the Texas Rules of Appellate Procedure. The trial court held a Rule 24 hearing and the trial court signed an order requiring Oxbow to post a $2,353,284 bond and an additional $8,979,720 bond if any appeal remains pending on February 15, 2019.

14

Appeals[5]

In cause number 09-18-00359-CV, Oxbow filed an accelerated interlocutory appeal of the Order Denying Motion to Compel Arbitration. On appeal and in issue one, Oxbow argues the trial court erred in denying Oxbow's motion to compel arbitration because the allegations pleaded and litigated by PASE fall within the scope of the mandatory provision in the parties' HEA. Oxbow also filed with this Court a Rule 24.4 Motion to Review Amount of Appellate Security. *See* Tex. R. App. P. 24.4 (authorizing an appellate court, on motion from a party, to review the "(1) the sufficiency or excessiveness of the amount of security, . . . ; (2) the sureties on any bond; (3) the type of security; (4) the determination whether to permit suspension of enforcement; and (5) the trial court's exercise of discretion under Rule 24.3(a)."). PASE filed a response to Oxbow's Rule 24.4 Motion to Review Amount of Appellate Security.

In cause number 09-18-00392-CV, Oxbow appeals the Turnover Order. On appeal, Oxbow argues the trial court erred in entering the Turnover Order appointing a receiver to oversee Oxbow's operations when the trial court had no jurisdiction over the proceeding, the Turnover Statute does not authorize such unprecedented

---

[5] In each party's appellate brief, filed in both appellate cause numbers, the parties discuss both the Order Denying the Motion to Compel Arbitration and the Turnover Order.

relief, the underlying Arbitration Award and Judgment expressly rejected similar relief, and PASE waived any right to such relief in the HEA's exclusive remedy provision.

## Analysis

In issue one, Oxbow argues the trial court erred in refusing to compel arbitration because PASE agreed to arbitrate this dispute with Oxbow, the allegations in PASE's petition arise out of or in connection with the HEA, PASE's actions before and after filing this lawsuit confirm that this dispute is arbitrable, and PASE failed to meet its burden to defeat arbitration. According to Oxbow, the dispute was not litigated or decided by the 2010-2011 arbitration, but instead arose years later once Oxbow began suspending waste heat delivery under the HEA's suspension provision and based on revised $SO_2$ NAAQS and governmental demands for Oxbow to comply with the NAAQS and its permits.

PASE contends the trial court properly denied Oxbow's motion to compel arbitration because it did not apply to PASE's Application for Turnover Order, and the Federal Arbitration Act and the HEA do not preempt the use of the Turnover Statute. According to PASE, it "did not assert, nor did the Turnover Order decide, any new claims or causes of action, nor did the Order resolve any new 'dispute' or award new damages[,]" and "[t]here is certainly no reason to re-arbitrate the

16

collection of the Judgment from the first arbitration." PASE further argues on appeal that "[t]he presumption of arbitration has no applicability when PASE did not assert a new claim or cause of action, did not seek to recover damages in the Turnover proceeding and only sought to recover the damages awarded in the Judgment." In response to Oxbow's argument that PASE's claims in its petition were not litigated or decided by the 2010-2011 arbitration, PASE argues that it did not assert any new claims or causes of action against Oxbow or seek to recover any damages based on Oxbow's actions in 2016 or 2018, and no such claims or causes of action were decided in the Turnover Order.

We first address PASE's argument that it is merely seeking the trial court's assistance in enforcing the 2011 Arbitration Award and is not alleging a dispute. The judgment confirming the Arbitration Award incorporates the award and states it is "enforceable in the same manner as any other judgment or decree of the Court[]" and "resolves all claims in this case and is intended to be a final judgment." Despite this language, the Arbitration Award incorporated by the judgment stated the damages for lost revenues awarded to PASE was not a cash award requiring Oxbow to write a check, but "shall be handled in accordance with the specific provisions of the Heat Agreement regarding the heat bank as an offset." In other words, the Arbitration Award invoked the HEA and required the HEA to continue to provide

the parameters for the offset in the future. PASE's Petition and Application for Post-Judgment Enforcement alleges the following in part:

> . . . PASE was not to recover a monetary payment for damages directly from Oxbow, but was, instead, to recover the damages awarded in the Judgment by offsetting "Heat Payments" that the [arbitration] panel anticipated PASE would be making to Oxbow under Section 6 of the Heat Agreement over the next twelve or more years. Implicit in the Award was the assumption that from December of 2011, forward, Oxbow would honor its duties under the Heat Agreement to maximize the delivery of flue gas energy to PASE so that Heat Payments would be generated that PASE would offset to recover its Judgment. The Award also made clear that Oxbow was to meet its obligation to control pollution while simultaneously fulfilling its obligations to PASE under the Heat Agreement[.]
>
> . . . .
>
> [] Since the Award was decided, and particularly after the Award was upheld on appeal and became incorporated into the Judgment, Oxbow has continuously operated its calcining plant in a manner to insure that PASE will never receive enough flue gas energy to generate Heat Payments that PASE can offset to recover its Judgment. Oxbow accomplishes this objective by discharging waste heat through Oxbow's hot stacks to circumvent PASE in a manner intended to force PASE out of business and keep PASE from ever recovering its Judgment. Oxbow has stopped delivering flue gas energy to PASE's Boiler Nos. 3 and 4 completely and has been fluctuating its delivery of flue gas energy to Boiler No. 5 to the point that it is often barely operational. . . . Oxbow confirmed to PASE that the abatement of flue gas energy to Boiler Nos. 3 and 4 is permanent, with PASE not knowing if or when Oxbow will stop its delivery of flue gas energy to Boiler No. 5 altogether. . . .
>
> [] Like it did when it launched its failed arbitration claims in 2011, Oxbow now "justifies" its actions by claiming that it is curtailing and/or abating the delivery of flue gas energy to PASE due to pollution

concerns. In reality, Oxbow's position is based upon a thinly disguised pretext for a non-existent legal "obligation" to control ambient Sulphur Dioxide ($SO_2$) emissions. . . . Oxbow, rather than proactively implement any pollution control measures (to the extent it has any "concern" over possible future $SO_2$ regulations), has used the [NAAQS $SO_2$] monitoring process as a pretext to shut PASE down and keep PASE from ever recovering its Judgment. . . .

. . . .

. . . Oxbow cannot meet its obligations under the Heat Agreement, including its duties of good faith and fair dealing to PASE, by refusing to install $SO_2$ pollution control equipment or taking other pollution control measures while simultaneously stopping the delivery of flue gas energy to PASE and keeping PASE from recovering its Judgment under the guise of supposed $SO_2$ "compliance."

. . . .

[] As a result of Oxbow's continued failures to comply with the Heat Agreement, PASE needs the aid of this Court to recover its Judgment pursuant to the Turnover Statute, Tex. Civ. Prac. & Rem. Code §31.002.

In summary, PASE's Petition and Application for Post-Judgment Enforcement asserts that since the Arbitration Award, Oxbow has failed to comply with the HEA by suspending waste heat delivery to PASE. PASE further alleges that Oxbow claims its suspension is the result of the new emissions standards. The petition also asserts that Oxbow's refusal to install pollution control equipment or take other pollution control measures while stopping the delivery of waste heat constitutes a breach of Oxbow's duties of good faith and fair dealing under the HEA, even though

19

the arbitration panel expressly denied PASE's claim for breach of the duty of good faith and fair dealing in the prior arbitration. We conclude that the matters asserted in PASE's Petition and Application for Post-Judgment Enforcement constitute a dispute not litigated in the prior arbitration.[6]

We review a trial court's denial of a motion to compel arbitration for an abuse of discretion. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 642-43 (Tex. 2009) (orig. proceeding). A party attempting to compel arbitration under the FAA must establish that there is a valid arbitration agreement and show that the claims raised are within the scope of that agreement. *In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011) (orig. proceeding). There is a presumption favoring agreements to arbitrate under the FAA, but the presumption arises only after the party seeking to compel

---

[6] We note that in an April 8, 2017 letter from the PASE Manager to an Oxbow Vice-President with the subject line "Notice of Failure to Perform Material Obligations under the Heat Energy Agreement[,]" admitted at the hearing on the Turnover proceeding, the PASE Manager advised the following:

> Oxbow's interruption and suspension of Flue Gas delivery to PASE and its refusal to replace the stack, are failures to perform material obligations under Section 13.1(b) and a breach of the duty of good faith and fair dealing under the Heat Energy Agreement. Pursuant to Section 14.2, PASE is hereby providing notice to Oxbow of the occurrence/existence of a Dispute that should be referred to senior management of Oxbow. PASE hereby designates Ted Boriack and Ray Deyoe as its senior management representative(s) who will meet with Oxbow's senior management regarding this Dispute.

arbitration proves that a valid arbitration agreement exists. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737-38 (Tex. 2005) (orig. proceeding). If the party seeking to compel arbitration proves that a valid arbitration agreement exists, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcement of the agreement. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003).

In the trial court, Oxbow and PASE agreed that the arbitration provision in the HEA is valid. They disagree on whether the petition PASE filed should be governed by the arbitration clause. Oxbow argues that the trial court abused its discretion in determining arbitrability because the HEA states the AAA Rules apply and AAA Rule R-7(a) says the arbitrator shall have the right to determine the arbitrability of any claim.

"The determination of whether the arbitration agreement imposes a duty to arbitrate the claims in a particular dispute is a matter of contract interpretation." *See T.W. Odom Mgmt. Servs., Ltd. v. Williford*, No. 09-16-00095, 2016 Tex. App. LEXIS 9353, at *7 (Tex. App.—Beaumont Aug. 25, 2016, no pet.) (mem. op.) (not designated for publication). If the agreement clearly and unmistakably demonstrates that the parties intended to confer on the arbitrator the power to determine what disputes are arbitrable, the trial court lacks the power to decide that issue. *Id.* at **9-

10 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (concluding the question of determining primary power to decide arbitrability turns upon what the parties agreed to on the matter)). "Thus, when an arbitration agreement clearly and unmistakably demonstrates the parties' intent to confer on the arbitrator the power to determine substantive arbitrability, questions regarding gateway issues that are normally decided by the court will be submitted to the arbitrator." *Id.* at *10 (citing *Kaplan*, 514 U.S. at 943.).

The arbitration clause in the HEA provides that the parties shall resolve "[e]very dispute of any kind or nature between the Parties arising out of or in connection with this Agreement (each a "Dispute") . . . in accordance with Article 14 [titled "Dispute Resolution and Arbitration"], to the extent permitted by Law." The HEA also provides that "[a]ny Dispute that has not been satisfactorily resolved within 30 days of the delivery of a notice in accordance with Section 14.2(a) shall be submitted by either Party to binding arbitration pursuant to the procedures set forth in this Article and pursuant to the Arbitration Rules." The HEA provides that "'Arbitration Rules' shall mean the commercial arbitration rules of the American Arbitration Association." Rule R-7(a) of the American Arbitration Association Commercial Arbitration Rules states:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence,

scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.[7]

The HEA provides that each dispute of any kind or nature between PASE and Oxbow arising out of or in connection with the HEA, if not resolved within thirty days of the delivery of the required notice, shall be submitted by either party to binding arbitration pursuant to the AAA Commercial Rules, which provide in Rule R-7(a) that the arbitrator has the power to rule on his or her own jurisdiction and on arbitrability of any claim or counterclaim. The HEA, with its broad arbitration clause and incorporation of the AAA Commercial Rules, clearly and unmistakably shows that PASE and Oxbow intended to delegate gateway issues, such as jurisdiction and arbitrability, to the arbitrator. *See, e.g.*, *Trafigura Pte. Ltd. v. CNA Metals Ltd.*, 526 S.W.3d 612, 616-18 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (finding persuasive and applying reasoning of other Texas appellate courts and federal cases holding that express incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent to delegate issues of arbitrability to the arbitrator); *Schlumberger Tech. Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 802-03 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (broad arbitration clause and

---

[7] American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, Rule R-7(a), p. 13, (Rules amended and effective October 1, 2013), https://www.adr.org/sites/default/files/CommercialRules_Web.pdf.

incorporation of AAA Commercial Arbitration Rules by reference in the arbitration agreement sufficient to show parties intended the arbitrator to decide arbitrability); *Saxa Inc. v. DFD Architecture Inc*., 312 S.W.3d 224, 229-31 (Tex. App.—Dallas 2010, pet. denied) (broad arbitration clause that explicitly incorporated AAA rules served as clear and unmistakable evidence of parties' intent to delegate question of arbitrability to arbitrator); *Rio Grande Xarin II, Ltd. v. Wolverine Robstown, L.P.*, Nos. 13-10-00115-CV & 13-10-00116-CV, 2010 Tex. App. LEXIS 5189, at **20-23 (Tex. App.—Corpus Christi July 6, 2010, pet. dism'd) (mem. op.) (not designated for publication) (arbitration clause in earnest money contract stating that arbitration would be conducted "in accordance with the Commercial Arbitration Rules of the American Arbitration Association[]" clearly and unmistakably showed intent that arbitrator determine arbitrability); *see also Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp*., 748 F.3d 249, 262-63 (5th Cir. 2014); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("We agree with most of our sister circuits that the express adoption of [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.") We conclude the trial court abused its discretion when it denied Oxbow's Motion to Compel Arbitration. Issue one is sustained.

24

In issue two, Oxbow argues the trial court erred in entering the Turnover Order. We review orders under the turnover statute for an abuse of discretion and will reverse the trial court only if we determine that it acted in an unreasonable or arbitrary manner or without reference to any guiding rules and principles. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). In light of our rulings in cause number 09-18-00359-CV, the trial court had no jurisdiction and abused its discretion in entering the Turnover Order challenged in cause number 09-18-00392-CV. Issue two is sustained.

In cause number 09-18-00359-CV, we reverse the trial court's order denying Oxbow's Motion to Compel Arbitration, and we remand the cause to the trial court for further proceedings consistent with this opinion. Accordingly, we also vacate the trial court's Rule 24 Order because no appellate security is necessary. *See* Tex. R. App. P. 24. In cause number 09-18-00392-CV, we reverse the trial court's Turnover Order and vacate the order.

REVERSED AND REMANDED; REVERSED AND RENDERED.

_____
LEANNE JOHNSON
Justice

Submitted on November 19, 2018
Opinion Delivered December 13, 2018

Before McKeithen, C.J., Kreger and Johnson, JJ.